IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| TAS DISTRIBUTING COMPANY, INC., )<br>)<br>Plaintiffs, )<br>)<br>vs. )<br>)<br>CUMMINS INC., formerly known as )<br>CUMMINS ENGINE COMPANY, INC., )<br>)<br>Defendants. )<br>)<br>) | Case No. 07-1141 |

## CUMMINS INC.'S ANSWER AND AFFIRMATIVE DEFENSES

Cummins Inc. ("Cummins"), formerly known as Cummins Engine Company, Inc., by and through its attorneys, Foley & Lardner LLP and Davis & Campbell LLC, hereby submits its Answer and Affirmative Defenses to Plaintiff TAS Distributing Company, Inc.'s ("TAS") Complaint as follows:

## BACKGROUND

## THE PARTIES

1.  TAS is a corporation organized and existing pursuant to the laws of the State of Illinois, with its principal place of business and corporate headquarters located in Peoria, Illinois.

**ANSWER:** On information and belief, Cummins admits that TAS is an Illinois corporation with a principal place of business and corporate headquarters located in Peoria, Illinois.

2.  TAS is primarily engaged in the business of inventing, developing, engineering, marketing, and licensing patented, proprietary and innovative technology.

**ANSWER:** Cummins lacks knowledge or information sufficient to form a belief as to

the truth of the allegations of this Paragraph and, on that basis, denies the same.

3.     Cummins is a corporation organized and existing pursuant to the laws of the State of Indiana, with its principal place of business and corporate headquarters located in Columbus, Indiana.

**ANSWER:** Admitted.

4.     Cummins is primarily engaged in the manufacture of engines for use in trucks and other applications. Cummins sells tens of thousands of its so-called "ISX" and "ISM" engines each year to customers located throughout the world, including this Judicial District.

**ANSWER:** Cummins admits that it is engaged in the design, manufacture, distribution, and service of engines, power generation systems, and other related electrical technologies. Cummins also admits that it sells "ISX" and "ISM" engines to customers located throughout the world, including customers in this Judicial District. Cummins further admits that it has been engaged in the annual sales of at least a total of ten thousand units of its ISX and ISM engine products. Cummins denies the remaining allegations in this Paragraph.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction in this case pursuant to 28 U.S.C. § 1332(a), as there is complete diversity of citizenship between the only plaintiff and the only defendant, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

**ANSWER:** Cummins admits that there is diversity of citizenship between it and Plaintiff, and that Plaintiff purports to bring a claim that Plaintiff contends exceeds $75,000 (exclusive of interest and costs), which would establish subject matter jurisdiction. However, Cummins denies that TAS is entitled to any recovery against Cummins.

6.     Venue is proper in this Court because a substantial portion of the events giving rise to this action transpired in this Judicial District and the contracts between the parties that give rise to this action were executed in this Judicial District.

**ANSWER:** Cummins admits that venue is not impermissible. Cummins denies the

remaining allegations in this Paragraph.

7. Both parties have agreed to exclusive venue in Peoria, Illinois, of any and all controversies arising out of their contractual agreements.

**ANSWER:** Admitted.

8. Section 2 of the Master Agreement (defined and discussed below) executed between the parties, provides as follows:

> 2. Choice of Forum.
>
> Any action brought by Licensor or Licensee against the other in any way arising out of, relating to, or under the Agreements shall be brought only in a court of competent jurisdiction in Peoria, Illinois.

(Exhibit "A," p. 3).

**ANSWER:** Cummins admits that the Master Agreement was executed by the parties and that Section 2 of the Master Agreement includes the quoted language.

## NATURE OF THE ACTION

9. This is an action for breach of a licensing agreement between TAS and Cummins dated February 22, 1997, pursuant to which TAS granted to Cummins a worldwide, perpetual license to incorporate in its engines certain technology, called Temp-A-Stop, in exchange for which Cummins agreed to pay royalties to TAS according to a schedule incorporated in the Agreement. Cummins has failed to pay royalties to TAS for the embodiment of TAS' technology in tens of thousands of the ISX and ISM engines manufactured and sold by Cummins each year since at least 2005, perhaps earlier, and has further failed during this period to provide TAS with the monthly reports of sales of Products called for in the License Agreement.

**ANSWER:** Cummins admits that Plaintiff purports to bring a claim for breach of the Intellectual Property License Agreement entered into on February 22, 1997 and amended on or about June 3, 1998 (the "License Agreement"); however, Cummins denies any such breach. Under the License Agreement, Cummins admits that TAS granted Cummins a license to the Subject Technology and Related Intellectual Property (as those terms are defined in the Master Agreement) and that Cummins agreed to make certain royalty payments to TAS pursuant to the

terms of the License Agreement. Cummins further admits that TAS granted Cummins worldwide, perpetual license rights pursuant to the terms of Sections 3 and 4 of the License Agreement. However, Cummins denies that its ISX and ISM engines incorporate the Subject Technology or Related Intellectual Property, including the Temp-A-Stop system or any other TAS Technology. Cummins thus denies that TAS is entitled to any monthly reports of sales or to any royalties from Cummins' sales of its ISX and ISM engines. Cummins denies the remaining allegations in this Paragraph.

## TEMP-A-STOP

10.   TAS owns or is the exclusive licensee of the following patents with respect to the TAS Technology:

>United States Patent Number 4,421,075
>Canadian Patent Number 1,161,929
>Taiwan Patent Number UM 23769
>United States Patent Numbers 5,072,703; 5,222,469; 5,317,998; and RE36437.

**ANSWER:**   Cummins admits that in Schedule 1 of the License Agreement, TAS represents that it is the exclusive licensee of the above-identified patents. However, Cummins lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this Paragraph and, on that basis, denies the same.

11.   The Temp-A-Stop system, also referred to herein as "TAS Technology," consists, among other things, of a set of programming code which causes an engine's Electronic Control Module ("ECM") to emit a signal to an external relay when the vehicle is parked or not moving and idling for a predetermined period of time, and an inexpensive relay which, upon receiving the signal, shuts down the engine's ignition system, thereby stopping the engine and preventing any current from flowing to the vehicle's accessories.

**ANSWER:**   Cummins admits that Section 2(b) of the License Agreement contains the quoted language: "The Temp-A-Stop system is an engine-control system that can perform all of the following functions: (i) automatically stop the engine by overriding the ignition key if the

vehicle is parked or not moving and idling for a predetermined time; and (ii) provide a park break safety interlock to prevent false stops while the vehicle is moving or the interlocks are not properly initiated." Cummins lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this Paragraph and, on that basis, denies the same.

## THE AGREEMENTS

12. On or about February 22, 1997, TAS and Cummins entered into a series of agreements through which TAS granted to Cummins a worldwide, perpetual license, subject to certain rights retained by TAS, to incorporate in Cummins' engines various technologies developed by TAS, including the Temp-A-Stop system.

**ANSWER:** Cummins admits that it entered into certain agreements with TAS on February 22, 1997, including the Master Agreement, License Agreement, and Consulting Services Agreement. Cummins further states that these Agreements were amended on or about June 3, 1998. Cummins further admits that TAS granted Cummins worldwide, perpetual license rights pursuant to the terms of Sections 3 and 4 of the License Agreement. Cummins denies that its ISX and ISM engines incorporate the Temp-A-Stop system or any other TAS Technology. Cummins denies the remaining allegations in this Paragraph.

13. Those agreements included: a Master Agreement (the "Master Agreement"), an Intellectual Property License Agreement (the "License Agreement"), and a Consulting Services Agreement. Copies of all three agreements are attached hereto as Exhibits "A," "B," and "C," respectively, and are incorporated in this Complaint.

**ANSWER:** Cummins admits that it entered into the Master Agreement, the License Agreement, and the Consulting Services Agreement with TAS. Cummins admits that Exhibits A, B, and C to the Complaint purport to be copies of the Master Agreement, the License Agreement, and the Consulting Services Agreement, respectively. Cummins further states that these agreements were amended on or about June 3, 1998.

14. The Master Agreement generally governs the relationship between the parties, and deals with such topics as defined terms, non-competition, and protection of the technology.

**ANSWER:** Cummins admits that the Master Agreement contains "certain terms, conditions, agreements and definitions which shall apply to each and all of the Agreements," and that the Master Agreement includes sections entitled "Definitions," "Non-competition Covenants," and "Protection of Subject Technology and Related Intellectual Property." Cummins denies the remaining allegations in this Paragraph.

15. Under the Master Agreement, the term "Product" is defined as follows.

> (n) 'Product' shall mean any product, including any component or subassembly of the product, manufactured with or incorporating all or a substantial part of the Subject Technology.

(Exhibit "A," p. 2).

**ANSWER:** Cummins admits that Section 1(n) of the Master Agreement contains the quoted definition of "Product."

16. Under the Master Agreement, the term "Subject Technology" is defined as follows:

> (r) 'Subject Technology' shall mean any and all technology owned or licensed by TAS relating to the TEMP-A-START and TEMP-A-STOP systems, or any component or subassembly thereof, except the Excluded Technology, including without limitation: (i) patents, patent applications and patent disclosures; (ii) design, development, and manufacturing information in any form, whether or not patentable, including technical information, engineering and manufacturing techniques, inventions, designs, drawings, sketches, models, manuals, process and product information, materials and purchasing specifications and sources, and performance and quality control specifications; (iii) testing information, including instructions, procedures and specifications, and testing procedures and data relating to circuits, equipment and machines; (iv) computer or other apparatus programs relating to design, development, or manufacturing, including software or firmware related to computer-aided design, computer-aided engineering, computer-aided manufacture, or computer-integrated

>manufacture; (v) any form of information related to applications of the above-described technology, including information relating to the installation of the Products on trucks, tractors and other vehicles.
>
>Notwithstanding the above, the Subject Technology does not include the trademarks or tradenames TEMP-A-START and TEMP-A-STOP which are exclusively reserved by Licensor, to be used by Licensor in connection with its exploitation of its rights retained under Section 19 of the Master Agreement.

**ANSWER:** Cummins admits that Section 1(r) of the Master Agreement contains the quoted definition of "Subject Technology."

17. The License Agreement grants Cummins a license to manufacture two versions of the Temp-A-Stop system: an "Original ECM Product" in which the system programming is resident in the vehicle's ECM, and a "Retrofit Product," in which the programming is not resident in the original ECM.

**ANSWER:** Cummins admits that Sections 3 and 4 of the License Agreement granted Cummins a license to use and employ the Subject Technology and Related Intellectual Property to make, have made, use and sell any system based on the Subject Technology wherein the system programming can either be resident in the engine or vehicle control module (*i.e.*, "ECM" product), or wherein the system programming is not resident in the engine or vehicle control module (*i.e.*, "retrofit" or "replacement" product). Cummins denies that its ISX and ISM engines incorporate the Temp-A-Stop system or any other TAS Technology. Cummins denies the remaining allegations in this Paragraph.

18. The License Agreement also sets forth the royalty, payment, and accounting obligations which govern Cummins' use of the Temp-A-Stop system.

**ANSWER:** Cummins admits that the License Agreement contains Sections, namely Section 5 titled "Royalties" and Section 6 titled "Licensee's Minimum Payments Obligation," which Sections relate to royalty, payment, and accounting obligations. Cummins denies that its

ISX and ISM engines incorporate the Temp-A-Stop system or any other TAS Technology. Cummins denies the remaining allegations in this Paragraph.

19. Section 5 of the License Agreement provides, in pertinent part, as follows:

5. <u>Royalties.</u>

(a) From and after the Retrofit Stand-Alone Date, Licensee shall pay a royalty to Licensor for every Retrofit Product sold by Licensee, whether sold under the Cummins brand or some other name, at the rate of: one hundred dollars ($100) per unit sold by Licensee in the first year commencing with the Retrofit Stand-Alone Date; one hundred and twenty-five dollars ($125) per unit sold by Licensee in the second year commencing with the first anniversary of the Retrofit Stand Alone Date; and one hundred dollars ($100) per unit sold by Licensee in each year thereafter, commencing with the successive anniversaries of the Retrofit Stand-Alone Date. Royalties shall be paid on a monthly basis, with the first month beginning on the Retrofit Stand-Alone Date, within thirty (30) days after the close of each month.

(b) From and after the Original ECM Product Date, Licensee shall pay a royalty to Licensor for every Original ECM Product sold by Licensee, at the rate of one hundred dollars ($100) per unit for the first two thousand five hundred (2,500) unit sold by Licensee in each year, commencing with the Original ECM Product Date or anniversary thereof; and at the rate of fifty dollars ($50) per unit for each additional units sold by Licensee in each such year. Royalties shall be paid on a monthly basis, with the first month beginning on the Original ECM Product Date, within thirty (30) days after the close of each month.

(Exhibit "B," p. 3).

**ANSWER:** Cummins admits that Section 5 (titled "Royalties") of the License Agreement contains the quoted language.

20. The License Agreement also sets forth a minimum royalty schedule, requiring payments of $1,000,000 to TAS over five years, as follows:

<u>Schedule of Minimum Royalty Payments</u>

| | |
|---|---|
| Year 1 | $100,000 |
| Year 2 | $300,000 |

        Year 3                $200,000
        Year 4                $200,000
        Year 5                $200,000

(Exhibit "B", p. 4).

**ANSWER:** Cummins admits that Section 6 of the License Agreement contains, among other things, the quoted Schedule of Minimum Royalty Payments. Cummins denies the remaining allegations in this Paragraph.

21.      Section 6(e) of the License Agreement provides as follows:

> (e)    Within thirty (30) days after the end of each month, Licensee shall provide Licensor with a report, in form and content reasonably acceptable to Licensor, for Licensor to determine Licensee's compliance with its royalty and minimum payment obligations under this License Agreement.

(Exhibit "B," p. 5).

**ANSWER:** Cummins admits that Section 6(e) of the License Agreement contains the quoted language.

22.      On or about June 3, 1998, the parties entered into a certain First Amendment to Agreements (the "First Amendment"), a copy of which is attached hereto as Exhibit "D" and made a part hereof.

**ANSWER:** Cummins admits that the parties entered into a First Amendment to Agreements, with an effective date of June 3, 1998. Cummins admits that Exhibit D to the Complaint purports to be a copy of the First Amendment.

23.      TAS also entered into an amendment of its agreement with one of Cummins' competitor's Detroit Diesel Company ("DDC").

**ANSWER:** Cummins lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this Paragraph and, on that basis, denies the same.

24.      The primary purpose of that First Amendment was to implement the terms of a

settlement agreement between TAS and DDC, the non-monetary terms of which had been approved by Cummins, and to "dovetail" the agreements between TAS and Cummins and between TAS and DDC to facilitate the settlement of a lawsuit between TAS and DDC.

**ANSWER:** Cummins admits that the First Amendment contains the following quoted language:

> WHEREAS, TAS and DDC are in the process of settling the Pending TAS Action in a manner that requires certain revisions to the License Agreement and Master Agreement.
>
> WHEREAS, TAS and Cummins desire to amend the Consulting Agreement as set forth herein.

However, Cummins lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this Paragraph and, on that basis, denies the same.

## PERFORMANCE UNDER THE AGREEMENTS

25. Between the date of the execution of the Licensing Agreement and March 31, 2003, Cummins made the minimum royalty payments to TAS required by the License Agreement.

**ANSWER:** Cummins admits that it made the minimum royalty payments to TAS as required by the License Agreement. Cummins denies the remaining allegations in this Paragraph.

26. Cummins has, at all times, claimed that it never sold sufficient quantities of "Products" to exceed the minimum royalty payments required by the License Agreement.

**ANSWER:** Cummins admits that it made the minimum royalty payments to TAS as required by the License Agreement. Cummins denies that its ISX and ISM engines incorporate the Temp-A-Stop system or any other TAS Technology. Cummins denies the remaining allegations in this Paragraph.

27. Cummins has never made any payments to TAS under the License Agreement in excess of the minimum royalty payments.

**ANSWER:** Cummins admits that it made the minimum royalty payments to TAS as required by the License Agreement. Cummins denies that its ISX and ISM engines incorporate the Temp-A-Stop system or any other TAS Technology. Cummins denies the remaining allegations in this Paragraph.

### THE PRIOR LAWSUIT BETWEEN TAS AND CUMMINS ("*TAS v. Cummins I*")

28.   On February 3, 2003, TAS filed a Complaint against Cummins in this Court (Case No. 03-1026) ("*TAS v. Cummins I*"), a true and correct copy of which is attached hereto as Exhibit "E" and made a part hereof.

**ANSWER:** Cummins admits that TAS filed a Complaint against Cummins in this Court (Case No. 03-1026) ("*TAS v. Cummins I*") on or about February 3, 2003. Cummins admits that what purports to be a copy of the *TAS v. Cummins I* Complaint was attached as Exhibit E to the Complaint in this case.

29.   The Lawsuit was based on Cummins' failure to use "all reasonable efforts to market and sell ECM Products and Retrofit Products" under the License Agreement.

**ANSWER:** Cummins admits that TAS alleged breach of contract, in part, based on Section 6(f) of the License Agreement. Section 6(f) states "Licensee shall make all reasonable efforts to market and sell ECM Products and Retrofit Products so as to maximize the payment of royalties to Licensor under this License Agreement." In *TAS v. Cummins I*, this Court rejected TAS's argument and granted summary judgment to Cummins on this issue in this Court's January 21, 2005 Order. (*See* Order at 7-13). This Court's ruling was affirmed on appeal by the Seventh Circuit. *See TAS Distributing Company, Inc. v. Cummins Engine Company, Inc.*, Case No. 05-1371, 2007 WL 1704114 (7th Cir., June 14, 2007). Cummins denies the remaining allegations in this Paragraph.

30.   In an Order dated January 21, 2005, the United States District Court for the

Central District of Illinois, Peoria Division, in *TAS v. Cummins I*, granted summary judgment to TAS with respect to Cummins' obligation to make royalty payments to TAS under the License Agreement, stating, in pertinent part.

> "[W]hile Cummins' obligation to make minimum royalty payments ended on March 31, 2003, it has a continuing obligation to make per unit royalty payments if it sells products embodying TAS technology."

(Order at p.14. A true and correct copy of the January 21, 2005 Order is attached hereto as Exhibit "F" and made a part hereof.)

**ANSWER:** Cummins admits that the Court entered an Order on January 21, 2005 in *TAS v. Cummins I*. Cummins admits that page 14 of the Court's January 21st Order sets forth, among other things, the quoted language. Cummins admits that what purports to be a copy of the January 21, 2005 Order was attached as Exhibit F to the Complaint. Cummins denies the remaining allegations in this Paragraph.

### DISCOVERY OF THE EMBODIMENT OF TAS TECHNOLOGY IN ORIGINAL ECM PRODUCTS MANUFACTURED AND SOLD BY CUMMINS

31. TAS has just recently learned that, with the exception of the addition of an inexpensive relay, Cummins has, since 2005, and perhaps earlier, incorporated the Temp-A-Stop system in the ECMs of over 50,000 ISX and ISM engines manufactured and sold per year. Cummins' own wiring diagrams for the ISX and ISM engines both show an Original Equipment Manufacturer ("OEM") Connector No. 35 which functions to provide a signal that will operate a relay to shut off the truck's electrical system when the engine ECM shuts down the engine. (See Cummins Bulletins Nos. 3666268-03 & 3666269-03, attached hereto as Exhibits "G" and "H," respectively, and made a part hereof.)

**ANSWER:** Cummins denies that its ISX and ISM engines incorporate the Temp-A-Stop system or any other TAS Technology. Cummins admits that Exhibits G and H (attached to the Complaint) purport to be copies of Cummins Bulletins Nos. 3666268-03 & 3666269-03. Cummins denies the remaining allegations in this Paragraph.

32. Cummins' own wiring diagrams for the ISX and ISM engines, referenced in Paragraph 31 of the Complaint, also show two "Fault Code Lamps" which activate if the Temp-A-Stop system embodied in the engines malfunctions. (See Exhibits "G" and "H" above: Fault

Code Lamp 338 yellow and Fault Code Lamp 339 yellow.)

**ANSWER:** Cummins admits that the purported copies of Cummins Bulletins Nos. 3666268-03 & 3666269-03 include information relating to fault code indication lamps for the Cummins products. Cummins denies that the fault code indication lamps shown in the Cummins Bulletins pertain to the Temp-A-Stop system or any other TAS Technology. Cummins further denies that its ISX and ISM engines incorporate the Temp-A-Stop system or any other TAS Technology. Cummins denies the remaining allegations in this Paragraph.

33. In addition, Cummins has designed at least its ISX engines to include the following option: "shutdown accessory relay installed/not installed," which can be activated merely by connecting the ECM to a computer and exercising the "install" option. (See Exhibit "I" attached hereto and made a part hereof).

**ANSWER:** Cummins admits that Exhibit I makes reference to a "shutdown accessory relay installed/not installed," option, but Cummins denies that its ISX and ISM engines incorporate the Temp-A-Stop system or any other TAS Technology. Cummins denies the remaining allegations in this Paragraph.

34. Once the install option has been exercised and an inexpensive relay has been added, the Temp-A-Stop system in that engine is fully activated.

**ANSWER:** Cummins denies that its ISX and ISM engines incorporate the Temp-A-Stop system or any other TAS Technology. Cummins denies the remaining allegations in this Paragraph.

35. This feature is designed to shut down the engine and to prevent electrical items, such as headlights, marker lights, radios, etc. (accessories) from remaining on with the engine turned off, which could cause the batteries to discharge.

**ANSWER:** Cummins admits that the Cummins system includes a feature that is designed to shut down the engine after a predetermined period of time; however, Cummins

denies that the Cummins system incorporates the Temp-A-Stop system or any other TAS Technology. Cummins denies the remaining allegations in this Paragraph.

36. Pursuant to subparagraphs (n) & (r) of the Master Agreement, Cummins' incorporation of the Temp-A-Stop programming code into its ECMs constitutes the embodiment of TAS Technology into its engines and obligates Cummins to pay a royalty to TAS for every engine which incorporates the Temp-A-Stop programming code.

**ANSWER:** Cummins denies that its ISX and ISM engines incorporate the Temp-A-Stop system or any other TAS Technology. Cummins denies the remaining allegations in this Paragraph.

37. Under the Court's decision in *TAS v. Cummins I*, and the agreements themselves, whether Cummins promoted this feature is irrelevant; TAS Technology is nonetheless embodied in the engines sold by Cummins, and TAS is entitled to a royalty from Cummins.

**ANSWER:** Cummins denies that its ISX and ISM engines incorporate the Temp-A-Stop system or any other TAS Technology. Cummins denies the remaining allegations in this Paragraph.

## CLAIMS

### COUNT I: BREACH OF CONTRACT

38. TAS restates and realleges Paragraphs 1 through 37 of the Complaint as Paragraph 38 of this Count I of the Complaint.

**ANSWER:** Cummins repeats and incorporates its responses to the allegations contained in Paragraphs 1-37 as if fully set forth herein.

39. Pursuant to the License Agreement (Exhibit 'B"), Cummins is obligated to pay royalties to TAS for any Original ECM Product sold which embodies TAS Technology, to the extent such royalties due to TAS exceed the amount of the minimum royalties paid to TAS.

**ANSWER:** Cummins admits that the License Agreement requires Cummins to pay royalties if Cummins sells products that embody the TAS Technology covered by the

Agreements. However, Cummins denies that its ISX and ISM engines incorporate any TAS Technology and denies that Cummins owes TAS any royalty on its ISX and ISM engines.

40. Cummins has sold significantly more Original ECM Products than Cummins has disclosed to TAS.

**ANSWER:** Denied.

41. The number of Original ECM Products sold by Cummins entitles TAS to a royalty far in excess of the minimum royalties Cummins has paid to TAS; an amount in excess of $75,000, exclusive of interest and costs.

**ANSWER:** Denied.

42. On information and belief, all ISX and ISM engines manufactured and sold by Cummins have embodied TAS Technology since at least 2005, and perhaps earlier.

**ANSWER:** Denied.

43. TAS has fully performed its obligations under the Master Agreement and License Agreement.

**ANSWER:** Denied.

44. Notwithstanding TAS' performance of its obligations, Cummins has breached its obligations to TAS under the License Agreement by failing to report to TAS accurately its sales of Original ECM Products and by failing to make royalty payments to TAS when due.

**ANSWER:** Denied.

**COUNT II: ACCOUNTING**

45. TAS restates and realleges Paragraphs 1 through 44 of the Complaint as Paragraph 45 of this Count II of the Complaint.

**ANSWER:** Cummins repeats and incorporates its responses to the allegations contained in Paragraphs 1-44.

46.    Cummins has failed to comply with Section 6(e) of the License Agreement and provide TAS with the required monthly reports of sales of Products.

**ANSWER:**  Denied.

47.    TAS is entitled to an accounting of all Products sold by Cummins.

**ANSWER:**  Denied.

### AFFIRMATIVE DEFENSES

### First Affirmative Defense:  Failure To State A Claim For Relief

TAS's claims are barred, in whole or in part, because TAS has failed to state a claim upon which relief may be granted.

### Second Affirmative Defense:  Laches

TAS's claims are barred, in whole or in part, by the doctrine of laches.

### Third Affirmative Defense: Waiver

TAS's claims are barred, in whole or in part, by the doctrine of waiver.

### Fourth Affirmative Defense:  Estoppel

TAS's claims are barred, in whole or in part, based on the doctrine of estoppel.

### Fifth Affirmative Defense:  Failure to Perform

On information and belief, TAS's claims are barred, in whole or in part, because TAS failed to perform its obligations under the agreements between the parties.

### Sixth Affirmative Defense:  Res Judicata

TAS's claims are barred, in whole or in part, based on the doctrine of res judicata.

### Seventh Affirmative Defense:  Collateral Estoppel

TAS's claims are barred, in whole or in part, based on the doctrine of collateral estoppel.

### Eighth Affirmative Defense:  Other Affirmative Defenses
### Based On Later Discovered Evidence

Cummins reserves all affirmative defenses under Rule 8(c) of the Federal Rules of Civil Procedure and any other defenses, at law or in equity, that may now exist or in the future be available based on discovery and further factual investigation in this case.

**WHEREFORE**, Defendant Cummins, Inc. prays for entry of judgment:

    A.    That TAS' Complaint be dismissed in its entirety, and that TAS takes nothing thereby.

    B.    That Cummins be awarded its costs incurred herein;

    C.    That Cummins be awarded its attorneys' fees; and

    D.    Any such other and further relief as the Court deems to be reasonable and just.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Cummins hereby demands a jury trial.

Dated: July 25, 2007

Respectfully submitted,

CUMMINS INC.

/s/  David G. Lubben
David G. Lubben
DAVIS & CAMPBELL LLC
401 Main Street, Suite 1600
Peoria, Illinois  61602
309.673.1681 (Telephone)
309.673.1690 (Facsimile)

Jeanne M. Gills (IL Bar No. 6225018)
FOLEY & LARDNER LLP
321 North Clark Street, Suite 2800
Chicago, Illinois  60610-4764
312.832.4500 (Telephone)
312.832.4700 (Facsimile)

**Attorneys for Defendant CUMMINS INC.**

## **CERTIFICATE OF SERVICE**

I, David G. Lubben, an attorney, hereby certify that on **July 25, 2007**, I electronically filed the foregoing **CUMMINS INC.'S ANSWER AND AFFIRMATIVE DEFENSES** with the Clerk of the Court using the CM/ECF system, which will send notification and service of such filing to all attorneys of record.

/s/  David G. Lubben
David G. Lubben

David G. Lubben
DAVIS & CAMPBELL LLC
401 Main Street, Suite 1600
Peoria, Illinois  61602
309.673.1681 (Telephone)
309.673.1690 (Facsimile)

Jeanne M. Gills (IL Bar No. 6225018)
FOLEY & LARDNER LLP
321 North Clark Street, Suite 2800
Chicago, Illinois  60610-4764
312.832.4500 (Telephone)
312.832.4700 (Facsimile)