IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| TAS DISTRIBUTING COMPANY, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 07 CV 1141 |
| ) | |
| CUMMINS INC., formerly known as, ) | **PLAINTIFF DEMANDS** |
| CUMMINS ENGINE COMPANY, INC., ) | **TRIAL BY JURY** |
| ) | |
| Defendant. ) | |

## AMENDED COMPLAINT

Plaintiff, TAS DISTRIBUTING COMPANY, INC. ("TAS"), by and through its attorneys, Daniel J. Voelker, Jeffery L. Dorman and Jacob D. Koering of Freeborn & Peters LLP, for its Amended Complaint against Defendant, CUMMINS INC., formerly known as CUMMINS ENGINE COMPANY, INC. ("Cummins"), states as follows:

### I.    BACKGROUND

### THE PARTIES

1.    TAS is a corporation organized and existing pursuant to the laws of the State of Illinois, with its principal place of business and corporate headquarters located in Peoria, Illinois.

2.    TAS is primarily engaged in the business of inventing, developing, engineering, marketing, and licensing patented, proprietary and innovative technology.

3.    Cummins is a corporation organized and existing pursuant to the laws of the State of Indiana, with its principal place of business and corporate headquarters located in Columbus, Indiana.

4.       Cummins is primarily engaged in the manufacture of engines for use in trucks and other applications. Cummins sells tens of thousands of its so-called "ISX" and "ISM" engines each year to customers located throughout the world, including this Judicial District.

## JURISDICTION AND VENUE

5.       This Court has subject matter jurisdiction in this case pursuant to 28 U.S.C. § 1332(a), as there is complete diversity of citizenship between the only plaintiff and the only defendant, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.       Venue is proper in this Court because a substantial portion of the events giving rise to this action transpired in this Judicial District, and the contracts between the parties that give rise to this action were executed in this Judicial District.

7.       Both parties have agreed to exclusive venue in Peoria, Illinois, of any and all controversies arising out of their contractual agreements.

8.       Section 2 of the Master Agreement (attached hereto as Exhibit "A" and defined and discussed below) executed between the parties, provides as follows:

> 2.       Choice of Forum.
>
> Any action brought by Licensor or Licensee against the other in any way arising out of, relating to, or under the Agreements shall be brought only in a court of competent jurisdiction in Peoria, Illinois.

(Exhibit "A", p. 3).

## NATURE OF THE ACTION

9.       This is an action for breach of a licensing agreement between TAS and Cummins dated February 22, 1997, and subsequently amended in writing, pursuant to which TAS granted to Cummins a worldwide, perpetual license to incorporate in its engines certain technology, called Temp-A-Stop and Temp-A-Start, in exchange for which Cummins agreed to pay royalties

to TAS according to a schedule incorporated in the Agreements. Cummins has failed to pay royalties to TAS for the embodiment of TAS' technology in tens of thousands of the ISX and ISM engines (and perhaps other engine models as well) manufactured and sold by Cummins each year since at least 2005, perhaps earlier, and has further failed during this period to provide TAS with the monthly reports of sales of products called for in the License Agreement.

### TEMP-A-STOP AND TEMP-A-START

10. TAS owns, or is the exclusive licensee, of the following patents with respect to TAS Technology:

> United States Patent Number 4,421,075
> Canadian Patent Number 1,161,929
> Taiwan Patent Number UM 23769
> United States Patent Numbers 5,072,703; 5,222,469; 5,317,998; and RE36437.

11. The Temp-A-Stop system, also referred to herein as "TAS Technology," consists, among other things, of a set of programming code which causes an engine's Electronic Control Module ("ECM") to emit a signal to an external relay when the vehicle is parked or not moving and idling for a predetermined period of time, which, upon receiving the signal, shuts down the engine's ignition system, thereby stopping the engine and preventing any current from flowing to the vehicle's accessories.

12. The Temp-A-Start system, also referred to herein as "TAS Technology," consists, among other things, of a set of programming code which causes an engine's ECM to emit a series of signals to a series of external relays when the vehicle is parked or not moving and idling for a predetermined period of time, which, upon receiving the signal, turns on or shuts down the engine's ignition system either starting or stopping the engine, and either turning on or off the vehicle's accessories. In addition to being capable of being used by itself, the Temp-A-Stop system is also embodied within the Temp-A-Start system.

3

## THE AGREEMENTS

13. On or about February 22, 1997, TAS and Cummins entered into a series of agreements through which TAS granted to Cummins a worldwide, perpetual license, subject to certain rights retained by TAS, to incorporate in Cummins' engines various technologies developed by TAS, including the Temp-A-Stop and Temp-A-Start systems.

14. Those agreements included: a Master Agreement (the "Master Agreement"), an Intellectual Property License Agreement (the "License Agreement"), and a Consulting Services Agreement. Copies of all three agreements are attached hereto as Exhibits "A," "B," and "C," respectively, and are incorporated in this Amended Complaint.

15. The Master Agreement generally governs the relationship between the parties, and deals with such topics as defined terms, non-competition, and protection of the technology.

16. Under the Master Agreement, the term "Product" is defined as follows.

> (n) "Product" shall mean any product, including any component or subassembly of the product, manufactured with or incorporating all or a substantial part of the Subject Technology.

(Exhibit "A," p. 2).

17. Under the Master Agreement, the term "Subject Technology" is defined as follows:

> (r) "Subject Technology" shall mean any and all technology owned or licensed by TAS relating to the TEMP-A-START and TEMP-A-STOP systems, or any component or subassembly thereof, except the Excluded Technology, including without limitation: (i) patents, patent applications and patent disclosures; (ii) design, development, and manufacturing information in any form, whether or not patentable, including technical information, engineering and manufacturing techniques, inventions, designs, drawings, sketches, models, manuals, process and product information, materials and purchasing specifications and sources, and performance and quality control specifications; (iii) testing information, including instructions, procedures and specifications, and testing procedures and data relating

4

to circuits, equipment and machines; (iv) computer or other apparatus programs relating to design, development, or manufacturing, including software or firmware related to computer-aided design, computer-aided engineering, computer-aided manufacture, or computer-integrated manufacture; (v) any form of information related to applications of the above-described technology, including information relating to the installation of the Products on trucks, tractors and other vehicles.

Notwithstanding the above, the Subject Technology does not include the trademarks or tradenames TEMP-A-START and TEMP-A-STOP which are exclusively reserved by Licensor, to be used by Licensor in connection with its exploitation of its rights retained under Section 19 of the Master Agreement.

18.  The License Agreement grants Cummins a license to manufacture two versions of the Temp-A-Stop and Temp-A-Start systems: an "Original ECM Product" in which the system programming is resident in the vehicle's ECM, and a "Retrofit Product", in which the programming is not resident in the original ECM.

19.  The License Agreement also sets forth the royalty, payment and accounting obligations which govern Cummins' use of the Temp-A-Stop and Temp-A-Start systems.

20.  Section 5 of the License Agreement provides, in pertinent part, as follows:

5.   Royalties.

(a)  From and after the Retrofit Stand-Alone Date, Licensee shall pay a royalty to Licensor for every Retrofit Product sold by Licensee, whether sold under the Cummins brand or some other name, at the rate of: one hundred dollars ($100) per unit sold by Licensee in the first year commencing with the Retrofit Stand-Alone Date; one hundred and twenty-five dollars ($125) per unit sold by Licensee in the second year commencing with the first anniversary of the Retrofit Stand Alone Date; and one hundred dollars ($100) per unit sold by Licensee in each year thereafter, commencing with the successive anniversaries of the Retrofit Stand-Alone Date. Royalties shall be paid on a monthly basis, with the first month beginning on the Retrofit Stand-Alone Date, within thirty (30) days after the close of each month.

(b)  From and after the Original ECM Product Date, Licensee shall pay a royalty to Licensor for every Original ECM Product sold by Licensee, at the rate of one hundred dollars ($100) per unit for the first two thousand five hundred (2,500) unit sold by Licensee in each year,

5

        commencing with the Original ECM Product Date or anniversary thereof; and at the rate of fifty dollars ($50) per unit for each additional units sold by Licensee in each such year. Royalties shall be paid on a monthly basis, with the first month beginning on the Original ECM Product Date, within thirty (30) days after the close of each month.

(Exhibit "B," p. 3).

21.    The License Agreement also sets forth a minimum royalty schedule, requiring a payment of $1,000,000 to TAS over five years, as follows:

Schedule of Minimum Royalty Payments

| Year 1 | $100,000 |
| Year 2 | $300,000 |
| Year 3 | $200,000 |
| Year 4 | $200,000 |
| Year 5 | $200,000 |

(Exhibit "B," p. 4).

22.    Section 6(e) of the License Agreement provides as follows:

        (e)    Within thirty (30) days after the end of each month, Licensee shall provide Licensor with a report, in form and content reasonably acceptable to Licensor, for Licensor to determine Licensee's compliance with its royalty and minimum payment obligations under this License Agreement.

(Exhibit "B," p. 5).

23.    On or about June 3, 1998, the parties entered into a certain First Amendment to Agreements (the "First Amendment"), a copy of which is attached hereto as Exhibit "D" and made a part hereof.

24.    TAS also entered into an amendment of its agreement with one of Cummins' competitor's Detroit Diesel Company ("DDC").

25.    The primary purpose of that First Amendment was to implement the terms of a settlement agreement between TAS and DDC, the non-monetary terms of which had been

approved by Cummins, and to "dovetail" the agreements between TAS and Cummins and between TAS and DDC to facilitate the settlement of a lawsuit between TAS and DDC.

## **PERFORMANCE UNDER THE AGREEMENTS**

26.     Between the date of the execution of the Licensing Agreement and March 31, 2003, Cummins made the minimum royalty payments to TAS required by the License Agreement.

27.     Cummins has, at all times, claimed that it never sold sufficient quantities of the "Product" to exceed the minimum royalty payments required by the License Agreement.

28.     Cummins has never made any payments to TAS under the License Agreement in excess of the minimum royalty payments.

## **THE PRIOR LAWSUIT BETWEEN TAS AND CUMMINS ("*TAS v. Cummins I*")**

29.     On February 3, 2003, TAS filed a Complaint against Cummins in this Court (Case No. 03-1026) ("*TAS v. Cummins I*"), a true and correct copy of which is attached hereto as Exhibit "E" and made a part hereof.

30.     The Lawsuit was based on Cummins' failure to use "all reasonable efforts to market and sell ECM Products and Retrofit Products" under the License Agreement.

31.     In an Order dated January 21, 2005, the United States District Court for the Central District of Illinois, Peoria Division, in *TAS v. Cummins I*, granted summary judgment to TAS with respect to Cummins' obligation to make royalty payments to TAS under the License Agreement, stating, in pertinent part.

> "[W]hile Cummins' obligation to make minimum royalty payments ended on March 31, 2003, it has a continuing obligation to make per unit royalty payments if it sells products embodying TAS technology."

7

Order at 14. (A true and correct copy of the January 21, 2005 Order is attached hereto as Exhibit "F" and made a part hereof.)

### DISCOVERY OF THE EMBODIMENT OF TAS TECHNOLOGY IN ORIGINAL ECM PRODUCTS MANUFACTURED AND SOLD BY CUMMINS

32. TAS has just recently learned that Cummins has, since 2005, and perhaps earlier, incorporated the Temp-A-Stop and Temp-A-Start systems in the ECM's of over 50,000 ISX and ISM engines, and perhaps other engine models, manufactured and sold each year.

33. Cummins' own wiring diagrams for the ISX and ISM engines both show an Original Equipment Manufacturer ("OEM") Connector No. 35 which functions to provide a signal that will operate a relay to shut off the truck's electrical system when the engine ECM shuts down the engine. (*See* Cummins Bulletins Nos. 3666268-03 & 3666269-03, attached hereto as Exhibits "G" and "H", respectively, and made a part hereof.)

34. Cummins' own wiring diagrams for the ISX and ISM engines, referenced in Paragraph 33 of the Amended Complaint, also show two "Fault Code Lamps" which activate if the Temp-A-Stop system (which is embodied within the Temp-a-Start system) and/or the Temp-A-Start system malfunctions. (*See* Exhibits "G" and "H" above: Fault Code Lamp 338 yellow and Fault Code Lamp 339 yellow.)

35. In addition, Cummins has designed at least its ISX engines to include the following option: "shutdown accessory relay installed/not installed", which can be activated merely by connecting the ECM to a computer and exercising the "install" option. (*See* Exhibit "I" attached hereto and made a part hereof).

36. Once the install option has been exercised, the Temp-A-Stop system (which is also embodied within the Temp-A-Start system) in that engine is fully activated.

37. This feature is designed to shut down the engine and to prevent electrical items, such as headlights, marker lights, radios, etc. (vehicle accessories) from remaining on with the engine turned off, which could cause the batteries to discharge.

38. In addition to the programming code embodied in the ECM's of Cummins' ISX and ISM engines used to operate the Temp-A-Stop system (which is also embodied in the Temp-A-Start system), TAS has learned that other programming code unique to the Temp-A-Start system is also embodied in the ECM's of Cummins' ISX and ISM engines.

39. Pursuant to subparagraphs (n) & (r) of the Master Agreement, Cummins' incorporation of the Temp-A-Stop and/or Temp-A-Start programming code into its ECM's constitutes the embodiment of TAS Technology into its engines and obligates Cummins to pay a royalty to TAS for every engine which incorporates the Temp-A-Stop and/or Temp-A-Start programming code.

40. Under the Court's decision in *TAS v. Cummins I*, and the agreements themselves, whether Cummins promoted this feature is irrelevant; TAS Technology is nonetheless embodied in the engines sold by Cummins, and TAS is entitled to a royalty from Cummins.

## II. CLAIMS

### COUNT I

### BREACH OF CONTRACT

41. TAS restates and realleges Paragraphs 1 through 40 of the Amended Complaint as Paragraph 41 of this Count I of the Amended Complaint.

42. Pursuant to the License Agreement (Exhibit "B"), Cummins is obligated to pay royalties to TAS for any Original ECM Product sold which embodies TAS Technology, to the extent such royalties due to TAS exceed the amount of the minimum royalties paid to TAS.

9

43.  Cummins has sold significantly more Original ECM Products than Cummins has disclosed to TAS.

44.  The number of Original ECM Products sold by Cummins entitles TAS to a royalty far in excess of the minimum royalties Cummins has paid to TAS; an amount in excess of $75,000, exclusive of interest and costs.

45.  On information and belief, all ISX and ISM engines manufactured and sold by Cummins have embodied TAS Technology – both the Temp-A-Stop and Temp-A-Start systems – since at least 2005, and perhaps earlier.

46.  TAS has fully performed its obligations under the Master Agreement and License Agreement, and as amended.

47.  Notwithstanding TAS' performance of its obligations, Cummins has breached its obligations to TAS under the License Agreement by failing to report to TAS accurately its sales of Original ECM Products and by failing to make royalty payments to TAS when due.

## COUNT II

## ACCOUNTING

48.  TAS restates and realleges Paragraphs 1 through 47 of the Amended Complaint as Paragraph 48 of this Count II of the Amended Complaint.

49.  Cummins has failed to comply with Section 6(e) of the License Agreement and provide TAS with the required monthly reports of sales of Product.

50.  TAS is entitled to an accounting of all Product sold by Cummins.

### III. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, TAS DISTRIBUTING COMPANY, INC., respectfully requests the following relief:

A.    TAS requests that an accounting be ordered of all Product sold by Cummins, and that judgment be entered against Cummins for damages in the amount of all royalties due and owing to TAS under the License Agreement, plus statutory pre-judgment interest thereon from the date such royalty payments should have been made to TAS to the date of judgment, reasonable attorneys' fees and TAS' costs of suit; and

B.    TAS further requests such other and further relief as the Court deems appropriate under the circumstances.

Respectfully Submitted,

**TAS DISTRIBUTING COMPANY, INC.,**
Plaintiff


BY: /s/ Daniel J. Voelker
One of Its Attorneys

Daniel J. Voelker, Esq.
Jeffrey L. Dorman, Esq.
Jacob D. Koering, Esq.
Freeborn & Peters LLP
311 S. Wacker Drive, Suite 3000
Chicago, Illinois  60606
(312) 360-6458

Dated:  August 28, 2007

1387606v2