UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| TAS DISTRIBUTING COMPANY, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 07-cv-1141 |
| ) | |
| CUMMINS, INC. ) | |
| ) | |
| Defendant. ) | |

**O R D E R**

Before the Court are the Motion for Partial Summary Judgment as to Count I filed by Plaintiff, TAS Distributing Company, Inc. (hereinafter "TAS"), on November 13, 2007 [Doc. 36] and the Cross Motion for Summary Judgment filed by Defendant, Cummins, Inc. (hereinafter "Cummins"), on December 21, 2007 [Doc. 54].  For the reasons that follow, TAS' Motion on Count 1 is DENIED and Cummins' Motion on Count 1 is DENIED.

**INTRODUCTION**

The present Motions seem to center on some errant computer programming that TAS created, that is located in hardware contained in the engine compartments of two types of diesel truck engines produced by Cummins.  TAS and Cummins entered into various contracts in 1997 and 1998 whereby Cummins obtained a license to use technology created by TAS that would automatically turn off and on engines and various electronic accessories, like lights, in diesel trucks thereby saving battery power.  In exchange for use of the technology, Cummins

1

agreed to pay TAS a royalty for every TAS technology based system that was either incorporated in its engines or that was produced as a stand-alone unit that could be attached to an engine. In general, the contracts called for a minimum royalty for the first five years of the contract, which totaled $1 million, and a per unit royalty for every unit sold thereafter.

In a previous lawsuit filed with this Court,[1] TAS alleged that Cummins was not using reasonable efforts to market and sell its technology, in violation of the agreements. In a related vein, Cummins sought a declaration that it owed only minimum royalties for the first five years and owed no royalties thereafter. This Court found, in part, that TAS did not present evidence of any damages that resulted from Cummins' alleged failure to use reasonable efforts to sell and market its product. However, this Court did find that Cummins owed royalty payments beyond March 31, 2003, the last date that it owed minimum royalties, as provided by the contracts.

In the present lawsuit, the Third Amended Complaint alleges three breach of contract claims and one accounting claim. The present Motions only concern Count 1. In Count 1, TAS alleges that Cummins owes more royalties on the Original ECM or one box product than it has paid pursuant to the contracts. Specifically, TAS alleges that Cummins has sold more units than it has represented to TAS: from April 1, 1998 to March 31, 2003, Cummins owes more royalties than the minimum royalties that it has already paid; and, from March 31, 2003 to the present,

---

[1] *TAS Distributing Company, Inc. v. Cummins Engine Company, Inc.*, Case No. 03-cv-1036 (hereinafter "TAS I"), aff'd , 491 F.3d 629 (7th Cir. 2007).

Cummins owes additional royalties for units incorporated into its engines. TAS seeks payment of the royalties and 5% interest from the date that the royalties were due (which was monthly).

## BACKGROUND[2]

On February 22, 1997, TAS and Cummins entered into an Intellectual Property License Agreement (hereinafter *"License Agreement"*), which gave Cummins a worldwide, perpetual license to use specified TAS technology, subject to certain rights reserved by TAS. The parties also signed a Master Agreement that, as relevant to this lawsuit, defined various terms. Finally, the parties executed a *"First Amendment"* to the License Agreement that made Cummins' license non-exclusive (among other things).

The parties alternatively refer to the relevant technology as *"Temp-A-Start/Temp-A-Stop," "Original ECM Product," "One-Box Product,"* and *"Temp-A-Start/One-Box Product,"* and *"Stand-alone Temp-A-Stop Product."* As briefly noted above, the technology, regardless of the name, generally functions by automatically turning off and on the engine after it has been idling for a certain period of time and which turns on and off electronic accessories after the engine has been shut down

---

[2] The Court accepts as true all undisputed facts contained in the parties' statements of undisputed facts. However, each party challenges various nuances of practically every undisputed fact listed by the other party. Rather than go through each and every statement of undisputed facts, the objections, and the various commentary provided by the parties even when a fact is technically undisputed (which the Court fears would take more paper than it has on hand), the Court is providing the following narrative which contains a synthesis of the facts the Court finds relevant and which attempts to explain the parties positions based on those facts.

The technology at issue in the present Motions is contained in an engine's Electronic Control Module[3] (ECM).[4]

The First Amendment provides, in relevant part:

> Subject to the reservations, retentions and limitations set forth in Section 19 of the Maser Agreement and in this Section 3 of the License Agreement, Licensor grants to Licensee as 'co-exclusive worldwide license' . . . to the Subject Technology and Related Intellectual Property . . . to make, have made, use and sell the 'Temp-A-Start/One Box Product' . . . solely on Cummins branded engines that are either manufactured or sold by Cummins or any of its 50% or more owned subsidiaries . . . .
> 'Temp-A-Start/One Box Product' shall mean any system based on the Subject Technology which includes programming based upon the Subject Technology in the engine or vehicle electronic control module ('ECM'). (First Amendment ¶ A(3)(a)).[5]

---

[3] The module is a piece of hardware or box located in an engine compartment that contains a computer chip designed to control electronic functions and features.

[4] As oppose to the "Two-Box Product" or the "Retrofit Product" which is not contained in the engine's ECM and is a stand-alone product that can be attached to the engine. This Two-Box Product is not the subject of the present motions with respect to Count 1. It is the subject of Count 2 and the claim that Cummins failed to pay royalties on Two-Box Products sold [Doc. 34].

[5] This section replaced the following paragraph in the License Agreement:

> Subject to all of the rights (and related obligations) retained and reserved by the Licensor under Section 19 of the Master Agreement, Licensor hereby grants Licensee exclusive rights to use and employ the Subject Technology and Related Intellectual Property for any and all products or purposes, including without limitation the design, development, engineering, testing, installation, application, manufacture, distribution, advertising, and sale of Original ECM Products and Retrofit Products, subject to Licensee making the payments set forth in Sections 5 and 6 of this License Agreement. (License Agreement ¶ 3).

As relates to Count 1, the actual item that Cummins was granted a license to make and sell is the "Temp-A-Start/One Box Product" (hereinafter "one box product") as defined by the First Amendment.

While none of the agreements define the term "system," the term "Subject Technology" is defined in the Master Agreement as:

> Any and all technology owned or licensed by TAS relating to the TEMP-A-START and TEMP-A-STOP systems, or any component or subassembly thereof, except the Excluded Technology, including without limitation: (i) patents . . . (ii) design, development, and manufacturing information . . . (iii) testing information . . . (iv) computer or other apparatus programs relating to design, development, or manufacturing . . . (v) any form of information related to applications of the above-described technology, including information relating to the installation of the Products on trucks, tractors and other vehicles. (Master Agreement ¶ 1(r)).

Thus, the one box product is a system made by Cummins, based on TAS technology related to the Temp-A-Start and Temp-A-Stop systems, that includes programming based on the same TAS technology, that is incorporated in the engine or the vehicle's ECM.[6]

With respect to royalties, the License Agreement provided that Cummins would make either "actual royalty payments" or "minimum royalty payments" (for

---

[6] As described by the License Agreement, the "Temp-A-Start" system can start and stop an engine (based on various conditions and electronic signals, by "overrid[ing] the ignition key" when the vehicle isn't moving) in order to, in part, "control cab and sleeper temperature . . . [and] activate accessory items such as battery warmers, electric blankets, fuel tank heaters, and fuel line heaters." (License Agreement ¶ 2(a)). The "Temp-A-Stop" system can automatically stop the engine by overriding the ignition key. (License Agreement ¶ 2(b)). The ignition key is the device on a vehicle in which a key is inserted to start the engine. A U.S. Patent (No. 5,222,469) related to the Temp-A-Stop feature further indicates that the item shuts down accessories by taking power away from the ignition switch.

5

the first five years of the agreement), whichever is greater. (License Agreement ¶ 6(a)). The actual royalty payments that Cummins would pay are $100 for the first 2500 "Original ECM Product"[7] sold, and $50 per unit thereafter for any given year. (Id. ¶ 5(b). The payments are to be made monthly. (Id.) The minimum royalty payments were $100,000 for the first year, $300,000 for the second year, and $200,000 for the third through fifth year. (Id. at ¶ 6(a)).[8] In addition, the License agreement states that:

> To the extent that minimum royalty payments made by the Licensee exceed actual royalties paid by Licensee in a given year, such payments above and beyond actual royalties shall be credited against Licensee's future royalty obligations, provided that Licensee shall make the requisite yearly minimum payments specified in sections 6(a) of this agreement. (Id. at ¶6(c)).

Thus, if Cummins failed to sell enough units to meet the minimum royalty payment amount, it could offset future royalty payments by the difference. In order to determine whether such an offset is possible Cummins would have to tell TAS how many units were sold in any given year.[9] Such information would be contained in the monthly reports that Cummins owed TAS. (Id. at ¶ 6(e)).

---

[7] This term is defined in the Master Agreement as: "any Product which incorporates programming in the engine ECM at the time of vehicle assembly by the original equipment manufacturer." (Master Agreement ¶ 1(k). "Product," in turn, is defined somewhat circularly as "any product, including any component or subassembly of the product, manufactured with or incorporating all or a substantial part of the Subject Technology." (Id. at ¶ 1(n).

[8] These minimum royalty payments were due if Cummins failed to sell a sufficient number of both the "Original ECM product" (one box product) and the "Retrofit Product" (two box product) in order to generate greater actual royalty payments.

[9] The parties dispute how this offset clause is to be interpreted.

6

In addition to the foregoing, Cummins agreed to "make all reasonable efforts to market and sell ECM Products and Retrofit Products so as to maximize the payment of royalties to Licensor under this License Agreement." (Id. at ¶ 6(f)).

The result of these contracts is that Cummins was granted a license to use TAS technology to make and sell the "Temp-A-Start/One Box Product" which could incorporate the Temp-A-Start functionality and/or the Temp-A-Stop functionality and which was included in a vehicle's engine or ECM. In the event that Cummins sold such units, it owed royalties on such "Original ECM Products"[10] or one box product sold. And, Cummins must use reasonable efforts to market and sell the one box products. In furtherance of the contracts, Cummins developed and sold a product known as "ICON."

It would appear, then, to be a simple matter to determine how many one box products Cummins sold in the form of ICON and thus determine how much royalties are due. Alas, such is not the case.

In its memorandum with respect to Count 1 [Doc 37], TAS asserts that prior to the February, 1997 agreements, Cummins already had developed a "standard idle shutdown function" (hereinafter "ISF") for its heavy-duty truck engines that shut down the engine but not the accessories. In 1999, Cummins launched the ICON system, incorporated in the ECM, which used "subject technology" and which not only shuts down and restarts the engine, but also "shuts off power to the vehicle

---

[10] The First Amendment did not specifically replace this phrase with "Temp-A-Start/One Box Product" throughout the License Agreement.

7

accessories."[11]  The ICON system is, apparently, programming located in the ECM (software) and hardware in the form of an "ignition bus relay." However, in late 2002, Cummins represented that it could no longer incorporate ICON into the engine's ECM because of additional government regulations related to emissions. It appears that the regulations necessitated the use of various *physical* components of the ECM that would prevent use of the components by the ICON system. In particular, the emissions technology prevents "the input-output necessary for the ICON product."

TAS represents that the ECMs contained in Cummins' ISX and ISM engines nonetheless still contain computer programming that incorporates the subject technology (i.e. ICON software). TAS further asserts that ICON would work to shut down accessories, notwithstanding Cummins assertions that the system is removed from the ECM, by merely installing or connecting to an "ignition bus relay"[12] to/on the ECM. Such a relay, TAS asserts is marketed by Cummins on its website for the very purpose of shutting down accessories and is available for $10 from original equipment manufacturers and third parties. This relay is also referred by the parties as "Pin 35," a physical connection on the ECM.

---

[11] Not all engines sold by Cummins contained the ICON system as it was an option chosen by a customer.

[12] As far as the Court can tell, from the parties' description, a "bus" is merely an electronic connection that allows two or more wires to be connected. The Court surmises that it is much like a plug or wall jack.

Thus, TAS states that it is owed royalties for each ISX and ISM engine sold from 1999 that contains an ECM that contains subject technology that can be accessed by a consumer by a readily available piece of hardware.

In response, Cummins states it owes no royalties on any errant programming codes contained in the ECM. Cummins argues that the agreements provide that it owes royalties only on any "system" that contains "code" based on the subject technology. Moreover, because the programming is "non-functional" and because Cummins does not include the necessary hardware with its engines, it is not responsible for paying royalties.

ISF was developed by Cummins prior to its contracts with TAS and works by cutting off power to the fuel injectors thereby removing the flow of fuel to the engine cylinders (as oppose to cutting off power through the ignition switch). ISF is a standard feature on all of Cummins' engines and is a feature contained in practically all similar engines manufactured by different companies. Cummins further asserts, however, that it "was in possession of programming code for an accessory shutdown feature since early 1996." Cummins' engineers developed a system whereby the ECM, pursuant to a program (software), would send a signal via an "idle shutdown relay" (which functions like an on/off switch) that is connected to specific electronic features that would shut that particular feature off (hereinafter "ISF Plus System").

Cummins asserts that ISF is different from the ICON system and TAS technology in that it could only turn the engine off (i.e. it couldn't restart the

engine), it cut off the engine by turning the fuel injectors off rather than cutting power to the ignition switch, and it does not use a temperature gage in the cabin of the truck (like TAS technology) in order to determine when to shut an engine down. Moreover, the ISF plus system, it is undisputed, does not also turn *on* accessories: it merely turns certain accessories off.

With respect to ICON, Cummins states that the feature was included in ISM and ISX engines sold between 2000 and 2003. However, the feature was turned "off" by Cummins and could not be switched on or activated by its customers even though the programming was contained in the ECM. Cummins notes that the ICON system required various equipment, including a thermostat in the truck cabin, to function properly. Cummins states that only 976 engines from 2000 to 2003 were sold with an activated ICON system. Cummins stopped offering the ICON system in light of the new emissions standards, highlighted above, in 2003. Thereafter, Cummins states "some of the ECMs on engines sold between 2003 and 2007 may still have included 'dead' or unused code related to the integrated ICON system." These codes are unusable because "of a lack of pins in the ECM to provide the necessary input and output to that program module" – i.e. because of a lack of hardware. These unused codes remained because it would have taken too much time and money to re-write and test the overall program contained in the ECM after ICON would have been removed.

With respect to TAS' assertion that the ICON system could be utilized by simply using the ignition bus relay on the ECM, Cummins states that this is not the

10

case. It represents that ISM and ISX engines from 2003 to 2007 did contain Pin 35 (the ignition bus relay) on its ECM but that it only has two uses: the first is that it provides the input/output for the ISF Plus System; the second use is to connect a non-integrated ICON system[13] to the ECM. Each use is mutually exclusive and Pin 35, Cummins contends, cannot be used to activate the integrated ICON system program. Finally, Cummins states that in 2007, the entire code contained in the ECM units of the ISM and ISX engines was rewritten and any ICON code would have been eliminated.

With respect to royalty payments, Cummins asserts that it tendered, and TAS accepted, the minimum royalty payments for the first five years because it did not achieve sales that would generate actual royalties in excess of the minimum royalties. Moreover, it asserts that because it sold fewer relevant products than would exceed the minimum royalty payment amount, it is owed an off-set pursuant to ¶ 6(c) of the License agreement. Thus, in November 16, 2007, Cummins tendered to TAS payment in the amount of $136,225 to cover any additional royalties it owes. On December 21, 2007, Cummins further tendered $28,467.50 to cover additional royalties and interest TAS may claim. TAS rejected the November tender by a letter dated November 20, 2007 and presumably (there is no letter provided by the parties) rejected the December tender as well.

---

[13] That is, the "Temp-A-Start/Two Box Product" where the programming is not contained in the ECM and which is the subject of Count 2 and part of Count 3 of the Third Amended Complaint and the separately filed motions for summary judgment.

11

In response to these arguments, TAS states that Cummins is "playing fast and loose with the facts." TAS asserts that in TAS I, Cummins claimed before this Court and the Seventh Circuit Court of Appeals that it did not have an ISF Plus System. Therefore, it is judicially estopped from now claiming that it had the technology as early as 1996, that was incorporated in its engines.

In particular, TAS states that in TAS I, Cummins asserted that its technology was unique from TAS technology because it did not contain an accessory shut down feature. In Cummins' brief before the Seventh Circuit, on appeal of TAS I, Cummins stated:

> Nor did TAS produce any competent evidence that Cummins' standard idle shutdown function is a 'comparable product.' The evidence is undisputed that idle shutdown, which shuts down the vehicle engine but does not disconnect power to the accessories, is a standard feature of electronic heavy-duty engines, and Cummins (as well as other manufacturers) has included that feature on its engines since well before the agreements were executed.
>
> ***
>
> The Temp-A-Stop technology and Cummins' idle shutdown function are not identical. As TAS points out, they operate differently: Temp-A-Stop shuts down electrical power to the accessories; the standard idle shutdown function does not.
> (Cummins' Appellate Brief pp. 17-19).

This argument was made to challenge TAS' argument that its damages could be calculated by using the sale of ISF as a benchmark.[14] TAS argues here that if Cummins argued in TAS I that it did not independently develop the ISF Plus

---

[14] As noted above, TAS lost TAS I because it could not prove damages – this Court found that its damages calculations were speculative.

System, then it cannot now argue that it developed that technology in 1996. Further, if Cummins is judicially estopped from claiming that it has an ISF Plus System, this Court can only conclude that any such accessory shut down technology located in the ECM must be based on TAS technology.[15] In response, Cummins argues that TAS has misread and misrepresented the Seventh Circuit's (and this Court's) opinion in TAS I.

### STANDARD

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the responsibility of informing the Court as to portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant may meet this burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case." Id. at 325.

Once the movant has met its burden, to survive summary judgment the "nonmovant must show through specific evidence that a triable issue of fact remains on issues on which [s]he bears the burden of proof at trial." Warsco v. Preferred

---

[15] In footnote 2 on page 21 of Cummins' memorandum in support of it cross motion for summary judgment [Doc. 54], Cummins states that its attorneys were not aware of this functionality (the ISF Plus System) during litigation in TAS I. Cummins states that its attorneys only became aware of the development of this feature while investigating the claims in the present lawsuit.

13

Tech. Group, 258 F.3d 557, 563 (7th Cir. 2001); See also Celotex Corp., 477 U.S. at 322-24. "The nonmovant may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; it must go beyond the pleadings and support its contentions with proper documentary evidence." Chemsource, Inc. v. Hub Group, Inc., 106 F.3d 1358, 1361 (7th Cir. 1997).

This Court must nonetheless "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]." Holland v. Jefferson Nat. Life Ins. Co., 883 F.2d 1307, 1312 (7th Cir. 1989). In doing so, this Court is not "required to draw every conceivable inference from the record -- only those inferences that are reasonable." Bank Leumi Le-Isreal, B.M. v. Lee, 928 F.2d 232, 236 (7th Cir. 1991). Therefore, if the record before the court "could not lead a rational trier of fact to find for the non-moving party," then no genuine issue of material fact exists and, the moving party is entitled to judgment as a matter of law. McClendon v. Indiana Sugars, Inc., 108 F.3d 789, 796 (7th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). However, in ruling on a motion for summary judgment, the court may not weigh the evidence or resolve issues of fact; disputed facts must be left for resolution at trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

# ANALYSIS

It is clear from the parties' voluminous briefs and mounds of evidence (in addition to ongoing discovery disputes) that there exist questions of fact that precludes summary judgment on Count 1.

In Illinois, the basic requirements necessary for contract formation are an offer, acceptance, and consideration. <u>Melena v. Anheuser-Busch, Inc.</u>, 847 N.E.2d 99, 109 (Ill. 2006). "To succeed on a claim for breach of contract, a plaintiff must plead and prove the existence of a contract, the performance of its conditions by the plaintiff, a breach by the defendant, and damages as a result of the breach." <u>Kopley Group V., L.P. v. Sheridan Edgewater Properties, Ltd.</u>, 876 N.E.2d 218, 226 (Ill. App. Ct. 2007). TAS has shown that a contract was formed and that it performed its end of the bargain. TAS alleges that Cummins breached the contract by failing to pay the necessary royalties on the one box product. TAS is not seeking resolution of any damages that it may be owed.

There is a genuine issue of material fact as to whether Cummins included the one box product in its engines during the relevant time period. TAS has presented evidence that active ICON programming is contained in the ECM of the engines and that the programming can by accessed via Pin 35. Once access is achieved, anyone can use the subject technology to turn on and off various accessories in the truck. Cummins, on the other hand, has presented evidence that any such programming is "dead" and unusable. Further, Cummins has presented evidence that even if the program was usable, it still cannot be physically accessed via Pin

15

35.  As such, there exists a question of fact as to whether the ISX and ISM engines' ECM contains the one box product, and whether such a product is accessible, such that Cummins breached the agreement by failing to pay royalties on the system.

### Judicial Estoppel

TAS nonetheless asserts that Cummins is judicially estopped in Count 1, from asserting that it developed idle management technology in 1996 because it prevailed in TAS I on the opposite ground.  The doctrine provides that "when a party prevails on one legal or factual ground in a lawsuit, that party cannot later repudiate that ground in subsequent litigation based on the underlying facts." Urbania v. Central States, Southeast and and Southwest Areas Pension, 421 F.3d 580, 589 (7th Cir. 2005).  For the doctrine to apply, "(1) the latter position must be clearly inconsistent with the earlier position; (2) the facts at issue must be the same in both cases; and (3) the party to be estopped must have prevailed upon the first court to adopt the position." Id.  This doctrine also is equitable in nature and "is designed to prevent the perversion of the judicial process." Cannon-Stokes v. Potter, 453 F.3d 446, 448, (7th Cir. 2006); Commonwealth Ins. Co. v. Titan Tire Corp., 398 F.3d 879, 887 (7th Cir. 2004) ("As judicial estoppel is an equitable concept, our law in this area is flexible. While there are boundaries, there is not a rigid set of rules to be enforced.").[16]  In TAS 1, Cummins successfully argued that

---

[16] In Carnegie v. Household Intern., Inc., 376 F.3d 656 (7th Cir. 2004), the Seventh Circuit stated:

> We have said that a party who prevails on one ground in a lawsuit cannot turn around and in another lawsuit repudiate the ground. If

16

TAS's damages calculations were speculative and that it could neither rely on the sales by Detroit Diesel nor pre-contractual negotiations. In its briefs before the Courts in TAS 1, Cummins also claimed that its ISF was not functionally equivalent to Temp-A-Stop because it could not switch off accessories. This "fact" however, was not discussed by either this Court or the Seventh Circuit. TAS argues, however, that if it had known of the ISF Plus System, it would have argued that damages were not speculative because damages could have been assessed by direct sales of engines with the ISF Plus System. Thus, it claims that Cummins may not have prevailed in the previous lawsuit on the damages argument. In sum, TAS argues that Cummins' current position is directly contradictory to it position in TAS I and would have resulted in the inapplicability of the "new product rule" to foreclose damages. TAS asserts that, had this fact been known, its measure of damages would not have been speculative, but would have been based on "the exact number of Cummins' engines that it actually shipped with an idle-management system that was functionally equivalent to Temp-A-Stop. . . . The very objections of this Court and the Seventh Circuit to TAS' lost sales estimate would have been inapplicable.

---

> repudiation were permitted, the incentive to commit perjury and engage in other litigation fraud would be greater. A party envisaging a succession of suits in which a change in position would be advantageous would have an incentive to falsify the evidence in one of the cases, since it would be difficult otherwise to maintain inconsistent positions. In other words, the purpose of the doctrine is to reduce fraud in the legal process by forcing a modicum of consistency on a repeating litigant. Id. at 660 (citations, quotation marks, and editing marks omitted).

There would have been *no need to estimate anything*.  Damages could *have been directly calculated*." (TAS Memorandum in Response and Reply to Motions regarding Count 1 [Doc. 80, pp. 8-9] (emphasis in original)).

Judicial estoppel "bars a party from obtaining two separate litigation victories, or a 'double recovery,' by asserting opposite legal or factual contentions in two separate legal actions based on the same underlying facts." Menominee Indian Tribe of Wisconsin v. Thompson, 161 F.3d 449, 454 (7th Cir. 1998).  First, the previous lawsuit involved the alleged lack of using reasonable means to market and sell TAS products, in particular it related to a stand-alone Temp-A-Stop product.  This count involves the failure to pay royalties.  Thus the facts at issue in this case (on Count 1) are not the same as the facts at issue in TAS 1.  See  United States v. Hook, 195 F.3d 299, 306 (7th Cir. 1999).  At the very least, TAS' claim in TAS 1, and the subject of its motion for summary judgment in that case, was limited to a stand-alone Temp-A-Stop product.  In this case (and in this Count as well as Count 3), TAS' claims are related to the integrated ICON product.  Second, the Court is not entirely convinced that Cummins' position is "clearly inconsistent."  It appears that in TAS 1, the parties omitted the fact that the ISF Plus System was available.  This is not necessarily inconsistent with the parties belief that *ISF*, by itself, did not shutdown accessories.  Nor is this Court convinced that Cummins "prevailed" on the fact that ISF did not have an accessory shutdown feature.  – this was neither mentioned by this Court or the Seventh Circuit as a grounds for relief.   Cummins also is not arguing different legal grounds: it still contends that TAS' damages

18

claims are speculative. In any event, the Court is not convinced that the purposes of judicial estoppel would be furthered by barring Cummins from presenting evidence regarding the ISF Plus System.

The purpose of the doctrines is to "to protect the integrity of the judicial process." Johnson v. ExxonMobil Corp., 426 F.3d 887, 891 (7th Cir. 2005). In particular:

> We have said that a party who prevails on one ground in a lawsuit cannot turn around and in another lawsuit repudiate the ground. If repudiation were permitted, the incentive to commit perjury and engage in other litigation fraud would be greater. A party envisaging a succession of suits in which a change in position would be advantageous would have an incentive to falsify the evidence in one of the cases, since it would be difficult otherwise to maintain inconsistent positions. In other words, the purpose of the doctrine is to reduce fraud in the legal process by forcing a modicum of consistency on a repeating litigant. Carnegie v. Household Intern., Inc., 376 F.3d 656, 660 (7th Cir. 2004) (citations, quotation mark, and editing marks omitted).

The Court does not find that Cummins acted fraudulently or that it intentionally, with a design and purpose of misleading the Courts, presented false evidence in TAS I. Cummins' "positions" in this lawsuit and TAS I are functionally equivalent: that TAS' damages requests are speculative. Moreover, this Court cannot find that "the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." United States v. Christian, 342 F.3d 744, 747-748 (7th Cir. 2003). TAS is afforded an opportunity to present it claims within the framework of a correct factual scenario. See Matter of Cassidy, 892 F.2d 637, 642 (7th Cir. 1990) (the doctrine "should not be used where it would work an injustice, such as where the former

position was the product of inadvertence or mistake"). For these reasons, Cummins is not judicially estopped from asserting its defense on Count 1 that it developed the ISF Plus System in 1996 and that this system, and not ICON or TAS technology, is accessed through the ECM.[17]

## CONCLUSION

For the foregoing reasons, the Motion for Partial Summary Judgment as to Count I filed by TAS [Doc. 36] is DENIED, the Cross Motion for Summary Judgment filed Cummins [Doc. 54] is DENIED


Entered this 31st day of March, 2009

                                                            s/ Joe B. McDade
                                                            JOE BILLY MCDADE
                                                        United States District Judge

---

[17] With respect to Count 1, While TAS knew, in TAS I, that ICON software was still contained in Cummins' ECMs, it was not aware that the software could be accessed via a "pin" on the ECM. TAS now believes that the software can be accessed and utilized via Pin 35 (thus completing the necessary "system" requirement). Cummins has presented no evidence that TAS became aware of this possibility until after TAS I concluded. Moreover, the issues in TAS 1 are distinct form the issues before this Court on Count 1: TAS 1 involved the alleged failure to use reasonable means; this Count involves the failure to pay royalties on the one box product. As such, *res judicata* does not apply to Count 1.