# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | |
|---|---|
| TAS DISTRIBUTING COMPANY, INC., | ) |
| Plaintiff, | ) |
| v. | ) Case No. 07 cv 1141 |
| CUMMINS, INC., | ) |
| Defendant. | ) |

## O R D E R  &  O P I N I O N

This matter is before the Court on Cummins' Motion for Partial Summary Judgment on Count II (Doc. 177).[1] TAS has responded in opposition to the motion (Doc. 183), and Cummins has replied (Doc. 187). For the reasons that follow, the motion is GRANTED in part and DENIED in part.

### BACKGROUND

The background facts involved in this case have been set out in numerous previous Orders; they are repeated here for purposes of completeness. TAS is an Illinois corporation that invents, develops, and licenses patented, proprietary technology which automatically turns vehicle engines and accessories off and on under certain circumstances. Cummins is an Indiana corporation that manufactures engines for use in trucks.

---

[1] Cummins' summary judgment motion, filed on July 10, 2009, is directed at Count II of the Fourth Amended Complaint. TAS filed a Fifth Amended Complaint on November 13, 2009 (Doc. 205). The filing of the Fifth Amended Complaint does not moot Cummins' summary judgment motion, as Count II is substantively identical as between the Fourth and Fifth Amended Complaints.

One of TAS' technologies is the "Temp-A-Stop" system, which consists of computer code that automatically shuts down a vehicle's engine and accessories when the vehicle is parked or idling for a preset period of time. TAS has also developed the "Temp-A-Start" system, which incorporates the Temp-A-Stop system and which, additionally, consists of computer code that automatically turns on a vehicle's engine and accessories under certain conditions. Temp-A-Stop and Temp-A-Start both come in two different versions: an "ECM Product" (in which the system programming is contained in an electronic control module located in the vehicle's engine) and a "Retrofit Product" (in which the system programming is not built into the vehicle's electronic control module, but rather, can be added to the vehicle's engine). The focus of Count II, and of the instant summary judgment motion, is the Retrofit Product.

In February 1997, TAS and Cummins entered into a series of agreements through which TAS granted Cummins a worldwide, perpetual license to incorporate in Cummins' truck engines various technologies developed by TAS, including the Temp-A-Stop and Temp-A-Start systems. One of these agreements was an Intellectual Property License Agreement ("License Agreement"), which provided for royalty and payment terms governing Cummins' use of the technology. Section 5 of the License Agreement is entitled "Royalties" and provides, in part, as follows:

> From and after the Retrofit Stand-Alone Date, Licensee shall pay a royalty to Licensor for every Retrofit Product sold by Licensee, whether sold under the Cummins brand or some other name, at the rate of: one hundred dollars ($100) per unit sold by Licensee in the first year commencing with the Retrofit Stand-Alone Date; one hundred and twenty-five dollars ($125) per unit sold by Licensee in the second year commencing with the first anniversary of the Retrofit Stand-Alone Date; and one hundred dollars ($100) per unit sold by Licensee in each

year thereafter, commencing with the successive anniversaries of the
Retrofit Stand-Alone Date. Royalties shall be paid on a monthly basis,
with the first month beginning on the Retrofit Stand-Alone Date,
within thirty (30) days after the close of each month.

(Exh. A to Doc. 177, License Agreement § 5(a)).[2] Section 6 of the License Agreement

is entitled "Licensee's Minimum Payments Obligation" and provides, in part, as

follows:

> Licensee covenants and agrees that, if Licensee shall have any of
> the rights granted to Licensee in Sections 3 and 4 of this License
> Agreement with respect to any of the Subject Technology or Related
> Intellectual Property, Licensee shall make, for each of the five (5) years
> commencing with the later of July 1, 1997 or the Decision Date in the
> Pending TAS Action or though [sic] settlement with DDC (the "Royalty
> Commencement Date"), either: (i) actual royalty payments of at least a
> total of the minimum royalty payments to Licensor according to the
> schedule below; or, if Licensee does not generate sufficient sales to
> meet the minimum royalty payments, (ii) payments within 30 days
> after the close of each year in addition to actual royalty payments for a
> total of the minimum royalty payments according to the schedule
> below.

Schedule of Minimum Royalty Payments

| | |
|---|---|
| Year 1 | $100,000 |
| Year 2 | $300,000 |
| Year 3 | $200,000 |
| Year 4 | $200,000 |
| Year 5 | $200,000 |

(License Agreement § 6(a)). Section 6(c) of the License Agreement provides as

follows:

> To the extent that minimum royalty payments made by Licensee
> exceed actual royalties paid by Licensee in a given year, such
> payments above and beyond actual royalties shall be credited against
> Licensee's future royalty obligations, provided that Licensee shall
> make the requisite yearly minimum payments specified in sections
> [sic] 6(a) of this Agreement.

---

[2] Section 5(b) of the License Agreement details royalty payments for sales of the
ECM Product.

(License Agreement § 6(c)).

After entering into the February 1997 agreements with TAS, Cummins created an "ICON Product," which integrated the Temp-A-Start system (TAS' engine stop/start technology). Cummins then offered ICON for sale in retrofit and ECM versions. During the five-year period in which minimum royalty payments were required under the License Agreement (i.e. April 1, 1998 to March 31, 2003, according to the Fifth Amended Complaint), Cummins represented to TAS that it did not sell sufficient ICON products (or any products incorporating TAS technology) to exceed the amounts of the required minimum royalty payments. Accordingly, Cummins paid only the required $1 million in minimum royalties for sales made during the minimum-royalty period. It is undisputed that Cummins fulfilled its minimum royalty obligations under the License Agreement.

With respect to Cummins' sales of ICON retrofit products (the subject of Count II), a portion of the parties' dispute centers on royalties due from June 1, 2003 onward.[3] In a previous lawsuit ("TAS I") between these same parties, concerning the same contract, this Court rejected Cummins' argument that its obligation to pay royalties under the License Agreement ended on March 31, 2003 at the termination of the minimum-royalty period. This Court, in interpreting

---

[3] TAS moved for, and was granted, partial summary judgment as to liability on Count II in March 2009. (Doc. 141). In moving for partial summary judgment on Count II, TAS characterized its claim as one for "royalties due it since June 1, 2003, for the sale by Cummins of the Two-Box Product" -- the Two-Box Product being the same thing as the ICON retrofit product. (Doc. 35 at p. 1). However, Count II of the Fifth Amended Complaint gives no clear indication that TAS' claim as to unpaid royalties on retrofit products is limited to the time period of June 1, 2003 onward. What is clear is that the Court's March 30, 2009 grant of partial summary judgment as to liability on Count II dealt only with the time period of June 1, 2003 onward.

Section 5 of the License Agreement, held that Cummins has a continuing, post-minimum-royalty-period obligation to make per-unit royalty payments under the License Agreement if it sells products embodying the licensed TAS technology. (Exh. B to Doc. 177, 1/21/2005 Order in Case No. 03-1026, at p. 14). Therefore, Cummins is obligated to pay TAS a royalty of $100 per ICON retrofit unit (which incorporates the subject TAS technology) sold after March 31, 2003. In its motion for partial summary judgment as to liability on Count II, TAS asserted that Cummins last paid royalties for retrofit product sales occurring in April 2003 and May 2003 and that Cummins failed to pay royalties on retrofit product sales occurring from June 1, 2003 onward. (Doc. 35 at pp. 6-7). In response, Cummins conceded this allegation, but added that, in November and December 2007, Cummins tendered payment to TAS for the total number of ICON products sold from June 2003 onward. (Doc. 51 at p. 10).[4] TAS rejected Cummins' tenders because it believed that the total amount tendered was less than what Cummins owed TAS.

One reason -- perhaps the main reason -- TAS found Cummins' tenders to be inadequate was because the total amount tendered incorporated a deduction pursuant to the "offset credit" built into the License Agreement at Section 6(c) (illustrated above). Cummins interprets Section 6(c) to mean that the $1 million it paid in minimum royalties over the first five years of the License Agreement is converted into a credit that can be used to cancel out $1 million in post-March 31,

---

[4] Cummins' December 2007 tender was purportedly designed as a supplement to its original November 2007 tender so as "to account for any potential disagreement between the parties over ICON sales in 1999 and any claim by TAS for prejudgment interest." (Doc. 51 at p. 10).

5

2003 royalty obligations. (See Doc. 177 at p. 8). TAS, on the other hand, asserts that any credit allowed by Section 6(c) was applicable only against actual royalties accrued during the minimum-royalty period. The interpretation of Section 6(c) is the primary focus of Cummins' instant motion for partial summary judgment. Cummins believes that if the Court agrees with its interpretation of Section 6(c), the parties' dispute about royalties on sales of the retrofit product becomes moot in light of Cummins' 2007 tenders to TAS. TAS disagrees with that logic.

## LEGAL STANDARD

Summary judgment should be granted where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). In ruling on a motion for summary judgment, the court must view the evidence on record in the light most favorable to the non-moving party. SMS Demag Aktiengesellschaft v. Material Sciences Corp., 565 F.3d 365, 368 (7th Cir. 2009). All inferences drawn from the facts must be construed in favor of the non-movant; however, the court is not required to draw every conceivable inference from the record. Smith v. Hope School, 560 F.3d 694, 699 (7th Cir. 2009). The court draws only reasonable inferences. Id. If the evidence on record could not lead a reasonable trier of fact to find for the non-movant, then no genuine issue of material fact exists, and the movant is entitled to judgment as a matter of law. McClendon v. Indiana Sugars, Inc., 108 F.3d 789, 796 (7th Cir. 1997).

## ANALYSIS

The first order of business is to interpret Section 6(c) of the License Agreement. The provision provides as follows:

> To the extent that minimum royalty payments made by Licensee exceed actual royalties paid by Licensee in a given year, such payments above and beyond actual royalties shall be credited against Licensee's future royalty obligations, provided that Licensee shall make the requisite yearly minimum payments specified in sections [sic] 6(a) of this Agreement.

(License Agreement § 6(c)). Under Cummins' interpretation of this provision, Cummins can use the entire $1 million it paid in minimum royalties as a credit against royalty obligations incurred after March 31, 2003 -- the end date of the minimum-royalty period. (Doc. 177 at pp. 8-9). Under TAS' interpretation of the provision, the credit can be taken only against actual royalties accrued during the minimum-royalty period. (Doc. 183 at pp. 26-27). TAS admits that the Section 6(c) credit is not limited by product. (Doc. 183 at p. 5).

The parties agree that Illinois law of contracts applies to this dispute. Under Illinois law, the construction of a contract presents a question of law to be decided by the court. <u>Gallagher v. Lenart</u>, 874 N.E.2d 43, 50 (Ill. 2007). A court's primary objective in construing a contractual provision is to give effect to the parties' intent, and the best way to do that is to look to the contractual language alone and attribute to the language its plain and ordinary meaning. <u>Id.</u> at 58. Illinois courts generally adhere to the "four corners" approach in interpreting contracts. <u>Bourke v. Dun & Bradstreet Corp.</u>, 159 F.3d 1032, 1036 (7th Cir. 1998) (applying Illinois contract law). Under the four corners approach, the interpreting court must first determine whether the contractual language is ambiguous. <u>Id.</u> Contractual

7

language is unambiguous if it lends itself only to one reasonable interpretation. Id. If the language in dispute is unambiguous, the court attributes to the language its plain meaning, and the dispute is over. Id. The mere fact that the parties do not agree on a single interpretation of a contractual provision does not, alone, render the provision ambiguous. Fleet Business Credit, LLC v. Enterasys Networks, Inc., 816 N.E.2d 619, 630 (Ill. App. Ct. 2004).

The Court finds Section 6(c) of the License Agreement to be unambiguous; however, neither party's interpretation is correct. Neither party has attributed to Section 6(c) its plain meaning. Section 5 and 6 of the License Agreement are interconnected. Section 5 lays out the "actual" royalties owed by Cummins based on Cummins' sales of products incorporating TAS technology. Section 5(a) concerns retrofit products in particular. Section 6(a) provides for "minimum royalty payments" for the first five years of the agreements, in the event that actual royalties generated do not exceed certain amounts. Section 6(a), in effect, establishes a floor below which royalty payments could not fall during the agreements' first five years. Section 6(a) breaks down the mandatory minimum royalty obligation into yearly payments, according to the following schedule:

<u>Schedule of Minimum Royalty Payments</u>

| | |
|---|---|
| Year 1 | $100,000 |
| Year 2 | $300,000 |
| Year 3 | $200,000 |
| Year 4 | $200,000 |
| Year 5 | $200,000 |

(License Agreement § 6(a)). Section 6(c) is invoked when "minimum royalty payments made by [Cummins] exceed actual royalties paid by [Cummins] in a given

8

year." For example, if Cummins' sales of ICON in Year 1 generated only $70,000 in "actual" royalties payable to TAS, Cummins would have to add $30,000 to its Year 1 royalties payment in order to meet its $100,000 minimum royalty obligation under Section 6 for that year. The $30,000 addition to the Year 1 payment would constitute "such payment[ ] above and beyond actual royalties" and the hypothetical $30,000 "shall be credited against [Cummins'] future royalty obligations." The credit comes with the caveat that "[Cummins] shall make the requisite yearly minimum payments specified in section[ ] 6(a) of this [License] Agreement." The caveat just means that Cummins cannot apply the credit so as to justify paying a lower amount for Years 1 through 5 than the minimum amounts specified in Section 6(a).

Cummins apparently believes that it is entitled to a $1 million credit based on its total payment of $1 million in minimum royalties from Years 1 through 5. The only way Cummins would be entitled to a Section 6(c) credit worth $1 million would be if Cummins generated zero actual royalties from Years 1 through 5. And the only way that could have happened is if Cummins sold zero products incorporating TAS technology during that time period. Although there is a dispute of fact as to the number of qualifying products sold, Cummins has never represented to this Court that it sold zero products incorporating TAS technology during the minimum-royalty period. Cummins' argument as to the amount of the offset credit is, therefore, based on an unreasonable interpretation of Section 6(c).

Now we move to TAS' interpretation of Section 6(c). TAS contends that the offset credit "can only be taken against actual royalties accruing during the

9

minimum royalty period." (Doc. 183 at p. 27). Unfortunately for TAS, that is not what the provision says. Section 6(c) simply states that the amount of the offset credit "shall be credited against [Cummins'] future royalty obligations." The provision does not include the type of temporal restriction that TAS advocates. Cummins' royalty obligations are continuing and did not end at the termination of the minimum-royalty period. (See 1/21/2005 Order in Case No. 03-1026, at p. 14). Accordingly, the offset credit, by its plain language, can be applied against "future royalty obligations" incurred by Cummins, without regard to whether those obligations were incurred within or outside of the minimum-royalty period. The only restriction that Section 6(c) places on the application of the credit is that Cummins must, under any scenario, make its yearly minimum royalty payments. It is undisputed that Cummins made its minimum royalty payments. Thus, the amount of the offset credit (however much that ultimately ends up being) can be applied to royalty obligations incurred by Cummins after March 31, 2003. If TAS wanted a further restriction on the application of the credit, it should have negotiated for different or additional language in Section 6(c). TAS contends that the offset credit is temporally limited to the minimum-royalty period because the provision is located within Section 6 (dealing with minimum royalty payments) instead of Section 5 (dealing with actual royalty payments) of the License Agreement. This argument is unpersuasive. The concept of minimum royalty payments is essential to the structure of the credit, and minimum royalty payments are not explicitly discussed in the License Agreement until Section 6. The fact that

the provision was included in Section 6 rather than Section 5 can be attributed to the logical, linear structure of the License Agreement.

Nor is the Court persuaded by TAS' argument that extrinsic evidence shows ambiguity in the language of Section 6(c). Although courts may consider extrinsic evidence for the purpose of determining whether an ambiguity exists in contractual language, see Fleet Business Credit, 816 N.E.2d at 630, the evidence offered by TAS does not rise to the level of creating an ambiguity as to the operation of Section 6(c). TAS points to a June 6, 2003 royalty payment by Cummins for sales of ICON retrofit products in April 2003 and May 2003 (after the minimum-royalty period had expired). (Doc. 183 at p. 24). In making that payment, Cummins did not assert the right to, or attempt to apply, the offset credit. TAS argues that if Cummins truly thought it was entitled to apply the offset credit against royalty obligations incurred outside the minimum-royalty period, Cummins would have attempted to use the credit to reduce the June 6, 2003 payment. TAS may have a point; however, TAS has shown only one mere instance of inconsistency by Cummins. If there were a pattern whereby Cummins paid TAS for post-March 31, 2003 royalty obligations without invoking the credit, the Court would be more apt to see it TAS' way and find some ambiguity. But the single instance of inconsistency by Cummins that TAS offers is not enough to render the otherwise unambiguous Section 6(c) ambiguous.

TAS also points to deposition testimony by Jeffrey D. Jones, who negotiated the License Agreement on behalf of Cummins as its Vice-President of Sales and Support for Engine Sales. (Doc. 183 at p. 28). In the piece of testimony offered by

11

TAS, Jones stated that he believed the License Agreement expired at the end of the minimum-royalty period. (Exh. G to Doc. 183, 4/6/2004 Dep. of Jeffrey D. Jones at pp. 91-92.; Doc. 187 at p. 14). TAS argues that if Jones believed Cummins' royalty obligation ended after the five-year minimum-royalty period, he must have also believed that the offset provision was limited to royalty obligations incurred by Cummins during that period. Although TAS' logic is plausible, the Court nonetheless refuses to find Section 6(c) ambiguous based on Jones' testimony. The testimony was taken from a deposition in connection with TAS I -- a previous lawsuit in this Court between these parties (Case No. 03-1026). That lawsuit did not focus on the operation of Section 6(c)'s credit provision, nor did Jones' deposition testimony focus on that provision. The Court does not find Jones' testimony as to the scope or duration of the entire Licensing Agreement especially helpful or relevant in the present context. Section 6(c) is unambiguous on its face, and the evidence offered by TAS to show extrinsic ambiguity is unpersuasive.

TAS also argues that the doctrine of res judicata bars Cummins from seeking a determination as to the meaning of Section 6(c). In TAS I, Cummins filed a counterclaim seeking a declaratory judgment that its royalty obligations ended at the termination of the minimum-royalty period. This Court awarded summary judgment to TAS on Cummins' counterclaim, holding that Cummins was under a perpetual obligation to pay TAS per-unit royalties each time it sold a product embodying TAS technology (1/21/2005 Order in Case No. 03-1026 at p. 14). TAS argues that the Court's decision on Cummins' counterclaim for declaratory relief in TAS I is res judicata against Cummins' current effort to litigate the issue of an

offset credit under Section 6(c). (Doc. 183 at pp. 20-21). In essence, TAS argues that, because Cummins could have raised a counterclaim concerning Section 6(c) in TAS I and did not, Cummins is now precluded from litigating Section 6(c) in this action.

Res judicata (or claim preclusion) prevents a party from litigating a claim that could have been decided in a prior action between the same parties or their privies. The res judicata effect of a prior judgment by a federal court sitting in diversity is governed by federal common law, which provides for the application of the law of the state in which the federal court sits. Semtek International Inc. v. Lockheed Martin Corp., 531 U.S. 497, 508 (2001). Therefore, Illinois' res judicata law applies, unless it "is incompatible with federal interests." Id. at 509. Illinois requires that three requirements be met in order for res judicata to bar a subsequent claim: "(1) there was a final judgment on the merits rendered by a court of competent jurisdiction, (2) there is an identity of cause of action, and (3) there is an identity of parties or their privies." River Park, Inc. v. City of Highland Park, 703 N.E.2d 883, 889 (Ill. 1998). Under Illinois law, an identity of cause of action exists as between two claims if the claims arose from a single group of operative facts. Id. at 893. The burden of establishing res judicata is on the party invoking the doctrine. Torcasso v. Standard Outdoor Sales, Inc., 626 N.E.2d 225, 228 (Ill. 1993).

The manner in which TAS is attempting to utilize the doctrine of res judicata is unusual: TAS is seeking to bar Cummins from asserting a defense -- not a claim -- in this action on account of an allegedly available counterclaim that Cummins did

not raise in TAS I. TAS does not address the peculiar fashion in which it seeks to apply the doctrine. That omission is reason enough to reject its res judicata argument, as TAS bears the burden of establishing that it is appropriate to apply the doctrine under the present set of circumstances. Further, even assuming that all the technical requirements for res judicata are met, it would not be fair to apply the doctrine under the present circumstances. Illinois courts recognize an equitable exception to the application of res judicata when applying the doctrine would produce an unjust result. See Welch v. Johnson, 907 F.2d 714, 722 n.7 (7th Cir. 1990); see also Hanania v. Loren-Maltese, 319 F. Supp.2d 814, 827 (N.D. Ill. 2004); Northern Trust Co. v. Aetna Life & Sur. Co., 549 N.E.2d 712, 716 (Ill. App. Ct. 1989); Benton v. Smith, 510 N.E.2d 952, 957-58 (Ill. App. Ct. 1987). Such is the case here. TAS has brought the instant suit, seeking to recover royalties owed under Section 5 of the License Agreement; yet, TAS wants to use res judicata to preclude Cummins from invoking a defense based on Section 6 of the Agreement. TAS' position is inconsistent and unfair. Further, the policy concerns underlying res judicata, such as finality and efficiency, are not in play under the circumstances here. The meaning of Section 6(c) was not at issue and was not determined in TAS I, and there is no efficiency to be gained, at this point in the present action, by refusing to interpret Section 6(c).

In sum, Cummins is entitled to an offset credit as described above. At this juncture, the Court is unable to calculate the exact amount of the credit because there is a dispute of fact as to the number of ICON products sold by Cummins during the minimum-royalty period. Section 6(c) is structured such that a

determination of the amount of actual royalties generated for each Year during the minimum-royalty period is essential in calculating the amount of the credit. On March 31, 2009, this Court denied the parties' cross-motions for summary judgment on Count I, finding there to be a dispute of fact as to the number of products sold by Cummins that incorporated TAS' ECM or "one box" technology. (See Doc. 146 at pp. 15-16).[5] Further, during the current round of briefing, the parties have submitted separate expert reports demonstrating what appears to be a dispute of fact as to the number of ICON retrofit products sold by Cummins between 1999 and 2008. (See Doc. 183 at p. 17; Doc 187 at p. 2).[6] Due to the question of fact as to ICON sales during the minimum-royalty period, the Section 6(c) credit cannot be calculated at this stage. The primary value of the present Opinion is to interpret how Section 6(c) operates -- an issue that the parties have squarely disputed.

Cummins has argued that its November and December 2007 tenders to TAS render Count II moot. The mootness argument, which seems to be based on Cummins' incorrect interpretation of Section 6(c), does not make much sense to begin with. TAS rejected Cummins' tenders because TAS thought the amounts

---

[5] TAS has since filed another motion for summary judgment on Count I, apparently under a different theory relating to the distinction between Temp-A-Stop (the engine stop technology) and Temp-A-Start (the engine start/stop technology). (See Docs. 211 & 212). The Court has not yet considered TAS' successive motion for summary judgment on Count I and offers no opinion as to that motion at this time.

[6] The parties have done a poor job at demonstrating to the Court that their respective experts are comparing apples to apples with respect to the time periods examined. For example, TAS' expert specifies in his report that he examined the number of retrofit products Cummins sold from March 1999 through December 2008. (Doc. 184-2 at p. 5). However, as far as the Court can tell, Cummins' expert examined ICON retrofit sales between 1999 and 2008 without breaking the time period down further by month. (Doc. 184-1 at Schedule 8.0).

tendered were inadequate. In effect, Cummins has taken the position that "because I offered TAS what I think I owe TAS, our dispute is moot." Under that logic, most disputes in litigation would be moot, as any settlement offer would automatically render the underlying dispute moot. Cummins' argument is without merit.

Lastly, the parties mention the issue of prejudgment interest on damages owed under Count II. However, it is more appropriate to address the issue of prejudgment interest once damages on Count II are precisely determined. When the issue of prejudgment interest comes into focus at some point down the line, it will likely require another round of briefing.

## CONCLUSION

Cummins' motion for leave to file an oversized reply brief (Doc. 186) is GRANTED. Cummins' motion for partial summary judgment on Count II (Doc. 177) is GRANTED in part and DENIED in part. The motion is granted in that the Court has interpreted Section 6(c) of the License Agreement, which was the primary subject of the motion. However, the Court has determined that the amount of the Section 6(c) credit cannot be calculated at this time, in light of disputes of fact concerning the amount of actual royalties generated by Cummins' sales of products incorporating TAS technology during the relevant time period. Further, the Court rejects Cummins' contention that TAS' claim in Count II is moot.

Entered this 10th day of December, 2009.

s/ Joe B. McDade
JOE BILLY McDADE
United States District Judge
