E-FILED
Wednesday, 05 May, 2010  04:08:37 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | |
|---|---|
| TAS DISTRIBUTING COMPANY, INC., )<br>  )<br> Plaintiff, )<br>  )<br> v. )<br>  )<br> CUMMINS, INC., )<br>  )<br> Defendant. ) | Case No. 07-cv-1141 |

## O P I N I O N and O R D E R

Before the Court are the Cross Motions for Summary Judgment filed by the parties (Docs. 211 and 221).  For the reasons set forth below, Plaintiff's Motion is DENIED (Doc. 211) and Defendant's Motion is GRANTED IN PART and TAKEN UNDER ADVISEMENT IN PART (Doc. 221).

### BACKGROUND

### I.    Procedural History

This lawsuit has resulted in numerous Orders that have attempted to outline the dispute between the parties.  In lieu of generating another extensive outline of the parties' dispute, the Court assumes familiarity with the claims in this case, the various Orders, and the documents filed in two other cases involving these parties, *TAS Distributing Co. v. Cummins Engine Co.*, 1:03-cv-1026 (hereinafter "TAS I") and *Cummins, Inc. v. TAS Distributing Company, Inc.*, 1:09-cv-1096 (hereinafter "TAS III").  This case is, of course, TAS II.

The Court notes that both parties have already filed motions for summary judgment (Docs. 36 and 54) on a previous incarnation of Count I (which were

denied, Doc. 146) for substantially the same reasons: TAS claims that its technology is located in engine ECMs manufactured by Cummins and that it is therefore owed a royalty on each such engine; and, Cummins claims that TAS' claims are barred by *res judicata* and that its claims fail on the merits regardless. This Court previously found that a question of fact existed with respect to Count I that precluded summary judgment for either party. This question of fact was related to what the Court considered the focus of the briefs: competing arguments that TAS technology resident in an ECM (i.e. ICON) is either "active" or "dead" and related arguments that it could or could not be accessed through Pin 35. This question of fact further drove this Court's conclusion on the *res judicata* argument: that TAS was not aware in TAS I, through affirmative statements made by Cummins, of access to ICON through Pin 35.

As is par for the course in this case, the current briefing has focused the Court's attention on the relevant issues – a focus that the Court did not achieve in the first round of briefing. Therefore, notwithstanding the substantially similar arguments, the Court will consider the arguments made in the current briefs anew.[1]

---

[1] To the extent that this Order changes any findings in the March 31, 2009 Order (Doc. 146), those findings are hereby reconsidered and modified or vacated so as to be consistent with the rulings and findings made herein.

## II.    Facts

### A.    Merits of TAS' Count I[2]

The License Agreement between the parties states that Cummins shall pay a royalty to TAS for every "Original ECM Product" sold by Cummins (License Agreement ¶ 5(b)).  The Master Agreement defines Original ECM Product as: "any Product which incorporates programming in the engine ECM at the time of vehicle assembly by the original equipment manufacturer" (*Id.* ¶ 1(k)).  "Product" is defined as: "any product, including any component or subassembly of the product, manufactured with or incorporating all or a substantial part of the Subject Technology" (*Id.* ¶1(n)).  "Subject Technology," in turn, is defined as

> Any and all technology owned or licensed by TAS relating to the TEMP-A-START and TEMP-A-STOP systems, or any component or subassembly thereof, except the Excluded Technology, including without limitation: (i) patents . . . (ii) design, development, and

---

[2] In Count I of the Fifth Amended Complaint (Doc. 205), TAS alleges that from April 1, 1998 to the present, Cummins has sold more Original ECM Products than it has disclosed to TAS.  In particular, "all ISX and ISM engines manufactured and sold by Cummins have embodied TAS technology – both the Temp-A-Stop and Temp-A-Start systems – since at least 2005, and perhaps earlier" (Fifth Amended Complaint, ¶ 48).

In footnote 2 of its memorandum in support of its Motion for Summary Judgment  (Doc. 212), TAS states that its previous Motion for Summary Judgment on Count I (Doc. 36) only concerned its "engine-stop system" and that its present motion on Count I concerns its "engine start/stop system."  Hence in the title to its Motion, TAS states that it is seeking summary judgment "as to Count I of the Fifth Amended Complaint regarding sales of Cummins Engines containing Temp-A-Start technology."

As noted in the November 5, 2009 hearing, TAS' Count I includes two claims: (1) that Cummins placed ICON code (that contains TAS technology – the Temp-A-Start and Temp-A-Stop systems) in its engines without paying a royalty and (2) Cummins' ISF Plus System contains TAS technology (the Temp-A-Stop system) which in turn would generate a royalty to TAS.  TAS' Motion before the Court only concerns the first theory, whether Cummins' engines contain TAS technology (in the form of ICON programming).   As such, TAS' Motion is a Motion for *Partial* Summary Judgment with respect to Count I and will be treated as such.

> manufacturing information . . . (iii) testing information . . . (iv) computer or other apparatus programs relating to design, development, or manufacturing . . . (v) any form of information related to applications of the above-described technology, including information relating to the installation of the Products on trucks, tractors and other vehicles.

(*Id.* ¶ 1(r)).  As provided by the License Agreement, Temp-A-Start is an "engine control system" that can "automatically start and stop an engine," among other things, based on various conditions like engine temperature and battery condition; and, Temp-A-Stop is also an "engine control system" that can, in part, "stop the engine by overriding the ignition key if the vehicle is parked or not moving and idling for a predetermined time" (License Agreement ¶ 2(a) and (b)).

The embodiment of these agreements is a product known as ICON.[3]

In its memorandum in support of its Motion for Summary Judgment (Doc. 212), TAS asserts that the CM 570 model ECM, located in Cummins' ISX and ISM engines, contains "active ICON computer programming code" (TAS Statement of Material Facts, Doc. 212, p. 5 ¶ 15)[4].  This programming could be "enabled by Cummins' Original Equipment Manufacturers ("OEMs") through software furnished by Cummins to its OEMs or through software obtainable from third parties" (Doc. 212, p. 5, ¶ 16).  The "engine mode"[5] of ICON could then be used (or

---

[3] It should be noted that TAS also alleges that Cummins included TAS technology in other features, such as the ISF Plus system.

[4] For ease of reference, statements of fact asserted by the parties will be referred to by CM/ECF document number, page, and paragraph.  The paragraph number is identical to the statement of fact contained in each of the briefs.

[5] There are two operating modes of the ICON system.  The "Engine Mode" is used to "maintain a minimum engine block temperature and battery charge" (Doc. 212-2, p.

activated) if various switches, an assembly, and relays are installed including "the hood tilt switch, the neutral position switch, the lamp assembly, the parking brake switch, the ignition bus relay, and the starter relay" (Doc. 212, pp. 5-6, ¶¶ 18, 20, 21). These switches, relays, and assembly[6] are also available from third parties (Doc. 212, p. 5, ¶ 19). Thus, TAS argues that because the CM 570 ECM located in these engines contains ICON code, which can be enabled through software and the installation of some hardware, the engines are an "Original ECM Product" and Cummins owes royalties for every such engine sold.[7] Similarly, TAS argues that it is irrelevant whether ICON code is actually enabled or connected to the hardware required for it to work. For TAS, it is sufficient that Cummins' engines contain "enableable" ICON software. By TAS' estimation, Cummins sold 193,198 such engines and consequently owes $9,909,900.00 in royalties.

In support of these facts, TAS relies almost exclusively on Cummins' first supplement response to TAS' third set of interrogatories (Doc. 212-2, Ex. H, pp. 45-49 (hereinafter "interrogatory response")) and an internal memorandum dated January 19, 1999 from Tom Kieffer to OEMs (Doc. 212-2, Ex. J, pp. 54-68 (hereinafter "Kieffer memo")). In the interrogatory response, Cummins states:

---

52). The "Cab Comfort Mode" is used "primarily to maintain cab temperature" (Doc. 212-2, p. 52).

[6] These relays, switches, and assembly (in addition to the two additional items identified *infra*) are referred hereinafter as "hardware."

[7] In its brief, TAS states that "[s]ince the Cummins engines containing the Model No. CM 570 ECM constitute Original ECM Products, Cummins owes TAS a royalty for every ISX and IXM engine that it sold which contained the Model No. CM 570 ECM" (Doc. 212, p. 12).

> Three programs, namely CALTERM, VEPS, and INSITE, can activate or turn on the computer code associated with Cummins' Integrated or 'one-box' ICON system in its CM570 ECMs. However, this alone, without the installation of the corresponding Integrated ICON sensors, is insufficient to 'enable' Cummins' 'one-box ICON system.' Neither the required sensors nor the method of installation were known to the general public, and Cummins provided no kit that included all sensors used by Integrated ICON. As such, if only the Integrated ICON software is enabled and none of the additional hardware elements of the Integrated ICON system are installed, then the Integrated ICON Engine and Cab Comfort modes of ICON will not operate.

(Doc. 212-2, p. 46). The Kieffer memo contains a chart which includes the hardware listed above, the prices of these components (for OEMs), and whether or not they must be purchased from Cummins (Doc. 212-2, p. 57-58). In a column entitled "[m]ust purchase from Cummins," the chart lists "no" for the rows containing the specific hardware identified above (Doc. 212-2, p. 58).

In its response (Docs. 222 and 224 (which is a sealed version)), Cummins basically argues that the "few lines of code" contained in the CM 570 ECM do not constitute "'all or a substantial part' of the TAS technology" (Doc. 224, p. 1). In contesting TAS' facts, Cummins first states that the CM 570 ECM contains "disabled Integrated ICON code" and refers to the interrogatory response highlighted above.[8] Cummins further states that in addition to the hardware indicated above, an Engine Start Alarm also must be installed which can only be purchased from Cummins (Doc. 224, p. 7, response to ¶ 19). Cummins then states that each of the additional facts highlighted above are immaterial (Doc. 224, pp 7-8, referring to TAS' SMF 16, 19, 20, and 21).

---

[8] Cummins also refers to other pages of the interrogatory responses; however, these pages do not appear to support its contention (Doc. 212-2, pp 48-49).

As additional facts, Cummins states that its "CM570 ISX and ISM engines contain thousands of lines of computer code; only a small portion of this code is related to Integrated ICON" (Doc. 224, p. 11, ¶ 13).[9]  Only an OEM can "enable" the ICON code and this can only be accomplished using Cummins' "INSITE software tool" or a "third-party software tool" called VEPS (Doc. 224, p. 11, ¶¶17-18).   In addition, to "enable" the ICON code, an OEM must install the hardware listed above in addition to a "CC/PTO On/Off Switch" (Doc. 224, p. 12, ¶ 21).   Cummins states that the installation instructions are contained in an Application Engineering Bulletin, to which it restricts access (Doc. 24, p. 13, ¶¶ 22-23).  Cummins states that it is not aware of any OEM that has "installed Integrated ICON without notifying Cummins" (Doc. 224, p. 13, ¶ 29).   To support these statements of fact, Cummins relies exclusively on the Declaration of Rich Thielmeyer, an Electronics Controls Leader who worked on the CM 570 ECM (Doc. 225, hereinafter "Thielmeyer Declaration"), and the declaration of Jeffrey D. Jones, a Vice President of Sales and Market Communication (Doc. 231-1, hereinafter "Jones Declaration").

In its reply brief (Doc. 239), TAS agrees that the ICON computer code can only be enabled via INSITE and VEPS (although it asserts that INSITE is publicly

---

[9] TAS takes issue with the term "small."  Of particular note, however, is that there appears to be no dispute that the CM 570 ECM contains more programs that just ICON.   Rich Thielmeyer states that "[s]ince the early 1990s, many Cummins diesel engines have included an Electronic Control Module ('ECM') that controlled the operation of the engine" (Doc. 225, p. 3, ¶ 12).  He further states that the ECM contains many "optional features" – presumably computer code related to features other than ICON that may be purchased and activated by OEMs or end-users (Doc. 225, p. 4-5, ¶¶ 21 and 22).   TAS has cited no evidence that the CM 570 ECM contains *only* computer code relevant to ICON nor has it provided any evidence that ICON constitutes a significant portion of the code.   Thielmeyer, on the other hand, declares that Integrated ICON comprises only a small portion of the thousands of lines of computer code contained in the CM 570 ECM.

available and that "downstream customers" could also use INSITE to enable the ICON computer code). TAS also necessarily agrees that ICON cannot be used by an end-user unless the hardware also is installed. Nonetheless, TAS asserts that facts related to installation of hardware in order to use ICON are immaterial. Importantly, TAS asserts that "[d]elivery of an engine by Cummins to an OEM with enableable ICON code is the royalty triggering event" (Doc. 239, pp. 12, 13, 15, responses to ¶¶ 21, 23, and 29).

Despite the parties' wrangling about various terms and their significance, it is clear that the parties agree on the following set of facts: The CM 570 ECM located in ISX and ISM engines contains ICON computer programming which incorporates TAS technology. The ICON computer programming has been included in CM 570 ECMs from 2000 to the present (although data is only available through October, 2009). The software is "inactive" but can be activated through the use of computer programs that are available to Cummins and OEMs, and perhaps third parties. This activated ICON can then be utilized by consumers if certain hardware is installed. This hardware is available to OEMs through Cummins or through third parties. ICON cannot be used if it is not "activated" or "enabled" and if it is not connected to hardware.

### B.    Res Judicata

Cummins argues that TAS' claims in Count I are barred by *res judicata* because they could have been brought in TAS I. In making this argument, Cummins states that TAS knew, in TAS 1, that the CM 570 ECM contained integrated ICON computer programming code and could have, and should have,

raised claims related to CM 570 ECM in that lawsuit. Cummins also argues that TAS knew, or should have known, that it had an accessory shutdown feature contained in its engines (the "ISF Plus System"). As such, TAS should have brought any claim related to Cummins' ISF Plus System in TAS I. As indicated above, this Order only concerns TAS' claim with respect to ICON; Cummins' arguments with respect to the ISF Plus System, then, will be considered in a subsequent Order (along with consideration of Cummins' arguments related to Count III).

In a March 3, 2004 deposition, Cliff Putterill, an OEM account manager of Cummins testified that access to ICON via hardware was discontinued because of new EPA emissions standards (Doc. 236-16, p. 4). He stated:

> A.   In 2001 we started the design towards the 2002 emission standards. What that required was additional sensors to be installed onto the engine to be able to operate the system. What that did was, it minimized or it put in a premium the IOUT, the pins that give access to the ECM. What that meant was that we ran out of pins to run both the cool EGR system and the ICON system.
>    At that time we looked at the sales volumes of ICON, compared it against what had been spend on the project up until that time and could not justify the additional expense that it would take to continue with the ICON in that form. It would have required an additional unit to be added to the system.
>
> Q.  When you say 'in that form,' you're talking about the integrated ICON product?
>
> A.  Totally resident in the engine control module. The logic could be there, we just didn't have the pins available to access all of the requirements.

(Doc. 236-16 (Ex. 19), pp. 33-34 (hereinafter "Putterill Deposition"); See Doc. 221, p. 8, ¶ 20). In an October 14, 1998 "ICON Royalty Meeting Minutes," it is noted that ICON is integrated into an ECM. The minutes go on to state that the integrated ICON is sold as an "engine option" that must be paid for by a consumer and then

activated (Doc. 233, p. 2-3; Doc. 221, p. 8 ¶ 21).  Two other documents produced also indicate that ICON is integrated into the CM 570 ECM and that other components are necessary for it to work (Docs. 227, 228; 221, p. 8-9, ¶¶ 22-23).  In particular, Cummins' exhibit 1-B is a manual entitled "ICON SYSTEM CM570 ELECTRONIC SUBSYSTEM TECHNICAL PACKAGE."  (Doc. 227).  This document details the components necessary for the use of an integrated ICON system, including the hardware necessary.  This document also is an operational manual that indicates how a user would use the ICON system's functions, how it can be programmed, how it can be tested, and other technical information.

With respect to Putterill's deposition testimony, TAS states that it is immaterial but goes on to state that, in addition to the above testimony: "In the same deposition, Putterill of Cummins also testified that as of March 4, 2004, the ECM's in Cummins' ISX and ISM engines still contained the ICON code (or software) in substantially the same form as that in the ECM's of Cummins ISX and ISM engines in 1999" (Doc. 239, pp. 24-25, Response to ¶ 20).[10]  The significance of this statement is that in 1999, ICON was accessible, whereas, in 2004 (during TAS I) TAS was under the impression that it was not accessible -- in all other respects the ICON code was identical.  TAS does not dispute that the two documents noted

_____

[10] Putterill agreed that "Cummins current ECM has the ICON  code in it," that it could not be accessed because of a lack of "pins," and that "everything" was "ported into the 870" (Putterill Deposition pp. 142-143).  TAS doesn't provide much context or explanation, however the Court assumes that Putterill is testifying that in light of the new EPA standards, a new ECM (again the Court assumes it is the CM 570 ECM) was developed.  He further indicates that programming, including ICON, was transferred from the old ECM to the new ECM, along with programming related to the EPA requirements and programming updates. Further, the pin used to access ICON was then used (and could only be used exclusively) to access programming related to the EPA requirements.

above were produced in TAS I nor does it dispute the content; rather, TAS asserts that they are immaterial to the issues before the Court.

From the above, it can be gleaned that in TAS I, TAS was privy to information regarding the technical nature of ICON: that it was comprised of software and hardware. TAS also was aware that ICON programming code was contained in a vehicle's ECM, that it needed to be activated, and that various hardware needed to be present and affixed to the ECM in order for it to be used by an end-user. TAS further was aware that, notwithstanding Cummins' assertion that Pin 35 could no longer be used to access ICON software, that software nonetheless was incorporated in ECMs that were developed to comply with EPA requirements in 2002 and was included in ECMs that were installed in Cummins' engines during the pendency of TAS I.

DISCUSSION

## I.    Standard

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."   Fed. R. Civ. P. 56(c).   The moving party has the responsibility of informing the Court as to portions of the record that demonstrate the absence of a genuine issue of material fact.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   The movant may meet this burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case."   *Id.* at 325.

Once the movant has met its burden, to survive summary judgment the "nonmovant must show through specific evidence that a triable issue of fact remains on issues on which he bears the burden of proof at trial."   *Warsco v. Preferred Tech. Group*, 258 F.3d 557, 563 (7th Cir. 2001); s*ee also Celotex Corp.*, 477 U.S. at 322-24. "The nonmovant may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; it must go beyond the pleadings and support its contentions with proper documentary evidence."   *Chemsource, Inc. v. Hub Group, Inc.*, 106 F.3d 1358, 1361 (7th Cir. 1997).

This Court must nonetheless "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]."   *Holland v. Jefferson Nat. Life Ins. Co.*, 883 F.2d 1307, 1312 (7th Cir. 1989).   In doing so, this Court is not "required to draw every conceivable inference from the record -- only those

12

inferences that are reasonable." *Bank Leumi Le-Isreal, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991). Therefore, if the record before the court "could not lead a rational trier of fact to find for the non-moving party," then no genuine issue of material fact exists and, the moving party is entitled to judgment as a matter of law. *McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 796 (7th Cir. 1997) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). However, in ruling on a motion for summary judgment, the court may not weigh the evidence or resolve issues of fact; disputed facts must be left for resolution at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

## II. Analysis

### A. Merits of Count I[11]

The question to be answered is what "technology" is the subject of the agreements upon which Cummins owes royalties to TAS. TAS would have this Court find that the "royalty-triggering" items are the ISX and ISM engines themselves because they contain the CM 570 ECM, which contains enableable ICON programming code which is based on TAS technology. TAS further argues that it is irrelevant whether ICON programming is actually enabled and actually usable in a meaningful manner (i.e. with the attached hardware). In advocating this position, TAS would convince this Court to find that whether or not its technology is actually *capable of being used or is in fact used* is irrelevant to this analysis. Thus, this Court would have to find that the mere availability of an ICON

---

[11] Generally, this Court would begin its analysis with the *res judicata* argument, a ruling on which may moot the merits arguments. However, as will become apparent, it is necessary to outline the issues contained in Count I in order to fully appreciate the Court's holding on *res judicata*.

computer program, that is capable of being enabled, in each of the ECMs contained in Cummins' engines, generates a royalty payment to TAS pursuant to the contracts.

Cummins on the other hand argues that the only royalty-generating technology is the total ICON package: a fully integrated, activated (i.e. enabled), and hooked-up-to-hardware (i.e. usable) system that would actually allow an end-user to automatically start and stop an engine (or otherwise benefit from the Temp-A-Start and Temp-A-Stop functionality).   For Cummins, a salient fact is whether it received payment for the use of ICON, which is an optional feature on its engines, from an OEM or consumer.  Thus, Cummins argues, again, that TAS has a damages problem.

Analysis of this dispute must start with the contracts that form the basis of the parties' relationship.  The construction of an unambiguous contract is a question of law.  *Gallagher v. Lenart*, 874 N.E.2d 43, 50 (Ill. 2007).  In construing the parties' contracts, the Court's function is to give effect to the parties' intent by "interpreting the contract as a whole and applying the plain and ordinary meaning to unambiguous terms."  *Joyce v. DLA Piper Rudnick Gray Cary LLP*, 888 N.E. 657, 662 (Ill  App. Ct. 2008);  *See also Reger Development, LLC v. National City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) ("During our review, we do not look at any one contract provision in isolation; instead, we read the document as a whole."); *Curia v. Nelson*, 587 F.3d 824,829 (7th Cir. 2009) ("In Illinois, as in other states, if a contract is unambiguous, the court will enforce it as written, without resorting to extrinsic evidence.").  A contract is considered ambiguous if it is "capable of being understood

in more sense than one," *Farm Credit Bank of St. Louis v. Whitlock*, 581 N.E.2d 664, 667 (Ill. 1991), or where it is "obscure in meaning through indefiniteness of expression." *Platt v. Gateway Intern. Motorsports Corp.*, 813 N.E.2d 279, 283 (Ill. App. Ct. 2004). The parties' mere disagreement, however, does not render a contract ambiguous. *Joyce*, 888 N.E.2d at 662; *See also Green v. UPS Health and Welfare Package for Retired Employees*, 595 F.3d 734, 738 (7th Cir. 2010). If a contract is ambiguous, its construction is a question of fact and parole or extrinsic evidence may be considered. *Curia*, 587 F.3d at 829.[12]

The first question, then, is whether the contracts are ambiguous. The Court finds that they are not. When all the definitions of the various terms highlighted above ("Original ECM Product," "Product," and "Subject Technology") are synthesized into one sentence, the contracts specify that: Cummins owes royalties for any product, manufactured with or incorporating all or a substantial part of the subject technology owned or licensed by TAS relating to an engine control system that can automatically start and stop the engine, which incorporates programming in the engine ECM at the time of vehicle assembly by the original equipment manufacturer. When the above requirement is read within the context of the whole License Agreement and Master Agreement, it is clear that the parties intended for the creation of an "original ECM product," that is integrated into Cummins' engines, as opposed to a second type of product (a Retrofit Product), that would be attached to an engine.

_____

[12] The parties seem to have lost the forest for the trees: neither party cites to any case authority regarding the interpretation of a contract even though it is the legal basis of TAS' brief and Cummins' response.

The contracts further define "subject technology":

"Subject Technology" shall mean any and all technology owned or licensed by TAS relating to the TEMP-A-START and TEMP-A-STOP systems, or any component or subassembly thereof, except the Excluded Technology, including without limitation:

(i) patents, patent applications and patent disclosures;

(ii) design, development, and manufacturing information in any form, whether or not patentable, including technical information, engineering and manufacturing techniques, inventions, designs, drawings, sketches, models, manuals, process and product information, materials and purchasing specifications and sources, and performance and quality control specifications;

(iii) testing information, including instructions, procedures and specifications, and testing procedures and data relating to circuits, equipment and machines;

(iv) computer or other apparatus programs relating to design, development, or manufacturing, including software or firmware related to computer-aided design, computer-aided engineering, computer-aided manufacture, or computer-integrated manufacture;

(v) any form of information related to applications of the above-described technology, including information relating to the installation of the Products on truck, tractors and other vehicles.

(License Agreement ¶ 1(r)). Thus, a relevant "product" contains "technology" derived from and based on the above technical information. Common sense dictates that such technology would drive the functionality of Temp-A-Start and Temp-A-Stop. The question that remains is whether the ISM and ISX engines represent "any product, including any component or subassembly of the product, manufactured with or incorporating all or a substantial part of the Subject Technology" or whether the phrase only means activated computer programming plus the necessary hardware that imparts functionality.

Based on a plain reading of the contracts taken as a whole, the Court must agree with TAS, for the most part. The definition of "Original ECM Product" is expansive and includes more than just the ICON system. The engine itself is also an "Original ECM Product" because it contains the ECM module which itself contains "Subject Technology" – in this case a computer program that is based on the information contained in ¶1(r) of the License Agreement. As such, Cummins would owe royalties on each engine "sold by Licensee." Cummins' interpretation would have this Court read into the contracts phrases that are not present, such as "activated programming" and "functionality." The contracts specify nothing of that sort. *See PPM Finance, Inc. v. Norandal USA, Inc.*, 392 F.3d 889 (7th Cir. 2004) ("courts are not in the business of rewriting contracts to appease a disgruntled party unhappy with the bargain it struck"). Cummins would also have this Court read into the contracts that *only* a fully activated and functional ICON system is an "Original ECM Product." Moreover, Cummins' damages argument would have this Court read into the contract that it owes royalties to TAS on engines *only if* it received payment from an OEM or end user for ICON. Such clauses are not contained in the "Royalties" subsection of the License Agreement – indeed, neither ICON itself nor sales of ICON are mentioned in the contracts (¶5(b)). While the Court is mindful that it should not interpret the contracts to reach an absurd result, and that Cummins' arguments make business sense, *see e.g. Baldwin Piano, Inc. v. Deutsche Wurlitzer GMBH*, 392 F.3d 881, 883 (7th Cir. 2004), the contracts simply do not support Cummins' arguments. *Cress v. Recreation Services, Inc.*, 795 N.E.2d 817, 838 (Ill. App. Ct. 2003) ("A trial court may not employ extrinsic evidence in

construing a contract unless it is necessary to resolve an ambiguity in the contractual terms.").

Along that same vein, it is not meaningless that TAS argues that "[d]elivery of an engine by Cummins to an OEM with *enableable* ICON code is the royalty triggering event" (emphasis added). Consistent with the above finding, that the contracts do not specify that TAS Technology be in a usable form, this Court also finds that whether or not TAS technology, in the form of ICON computer code or otherwise, is *enableable* is also not required under the contracts. The contracts merely call for royalties on a product manufactured with or containing a substantial part of the "subject technology." Just as there is no portion of the contracts which state that the technology must be in a "usable" form (as Cummins advocates) or that it only refers to ICON, there is also no portion of the contracts that state that the technology must be in an "enableable" form. This Court finds, as a matter of law, that the contracts only require that TAS technology is contained in a product in order to trigger the royalty clause – whether it is accessible, enableable, or usable is irrelevant.

This Court also finds that the undisputed evidence reveals that "ICON" is the end result of the parties' contracts and includes TAS technology.[13] Based on the evidence before the Court, ICON is a system containing (1) a program that drives various (2) hardware based on user input. The ICON system, it cannot be disputed,

---

[13] The activation, usability, or enableability of ICON itself is not relevant to interpretation of the contracts at issue because evidence related to these factors is extrinsic to the contracts. Thus, evidence related to hardware, user interfaces, Pin 35, or other similar matters is immaterial, and has always been immaterial, to the construction of these unambiguous contracts.

contains TAS Technology in the form of computer programming.  The Court therefore rejects all of Cummins' arguments, including its joint technology argument, that ICON does not contain TAS Technology.[14]  No jury would find as much.  TAS technology is not the hardware, but rather is, as TAS states, the "brains" of ICON.  As such, ICON incorporates a substantial part of TAS technology and is part of an "Original ECM Product" (if programming is included in the ECM).[15]

With this conclusion in hand, that the unambiguous contracts state that Cummins owes a royalty on each of its engines sold that contain TAS technology, TAS need only show breach of the contracts and damages (there is no questions as to TAS' performance).  *Zirp-Burnham, LLC v. E. Terrell Associates, Inc.*, 826 N.E.2d 430, 439 (Ill. App. Ct. 2005).  As to breach, there is no dispute that Cummins failed to pay royalties to TAS for each of the ISM and ISX engines sold that contain TAS technology (i.e. ICON computer code) in the CM 570 ECF.  As to damages, TAS' claim for damages is not speculative: one need only count up how many engines

---

[14] Cummins spins various statements it makes regarding whether ICON contains TAS technology.  The latest iteration is that: "Cummins anticipates that TAS will argue that Cummins has already admitted that its ICON product contains TAS technology.  While Cummins does not deny making this statement, only the ICON product, as a whole, contains TAS technology.  TAS has failed to explain how several lines of code related to Cummins' Integrated ICON product contain the Subject TAS technology."  (Doc. 222, p. 20, n. 10).  The Court accepts this admission and rejects the qualifier.  The Court finds, as a matter of law, that ICON programming (regardless of whether it is attached to hardware or other items) is part of a "product . . . manufactured with or incorporating all or a substantial part of the Subject Technology."

[15] If the ICON programming was not contained in an ECM, then ICON would be part of a Retrofit Product and not an Original ECM Product (only the latter of which is the subject of TAS' instant Motion for Summary Judgment).

Cummins sold that contained the CM 570 ECF which, it is undisputed, contains ICON computer code. Cummins' argument that damages are speculative because there is no evidence that an OEM or end-user actually activated and installed hardware for full ICON functionality, is without merit. It is immaterial whether ICON was activated, enabled, or usable. It is also immaterial that Cummins itself received no payment for the use of ICON.

In conclusion, this Court finds that the parties entered into valid and enforceable contracts which provide that Cummins owes a royalty for every engine that contains TAS technology. The practical effect of this conclusion is that Cummins owes a royalty for every engine that contains an ECM that contains ICON computer programming code (i.e. every engine that contains the CM 570 ECM). TAS performed its end of the bargain. Cummins breached the agreement by failing to pay royalties provided by the agreements. And, TAS was damaged in the amount of, at least, $9,909,000.00 in royalty payments. This conclusion, however, grants TAS only a Pyrrhic victory if TAS' claim is barred by *res judicata* as argued by Cummins.

## B.    Res Judicata[16]

As indicated in previous Orders of this Court, there is no question that Illinois law applies and that the only issue to be determined is whether there is identity of cause of action between this Count and TAS I.

---

[16] As indicated above, Count I of the Fifth Amended Complaint alleges that Cummins engines, via ICON, contain TAS technology and that Cummins' ISF Plus system also contains TAS technology for which Cummins owes a royalty.

Illinois law provides that "a final judgment on the merits rendered by a court of competent jurisdiction bars any subsequent actions between the same parties or their privies on the same cause of action." *Piagentini v. Ford Motor Co.*, 901 N.E.2d 986, 990 (Ill. App. Ct. 2009). The doctrine is equitable and "designed to prevent a multiplicity of lawsuits between the same parties where the facts and issues are the same." *Id.* As it is an equitable doctrine, it is applied "as fairness and justice require," and "will not be technically applied if to do so would create inequitable and unjust results" or where it would be "fundamentally unfair to do so." *Id.*

In order for *res judicata* to apply, three elements need be met: "(1) final judgment on the merits has been rendered by a court of competent jurisdiction; (2) identity of cause of action exists; and (3) the parties or their privies are identical in both actions." *Jackson v. Victory Memorial Hospital*, 900 N.E.2d 309, 317 (Ill. App. Ct. 2008). *Res judicata* not only precludes issues that were raised in the prior lawsuit, but also "those matters that could have been decided in that suit." *River Park, Inc. v. City of Highland Park*, 703 N.E.2d 883, 889 (Ill. 1998); *Treadway v. Nations Credit Financial Services Corp.*, 892 N.E.2d 534, 539 (Ill. App. Ct. 2008); *Altair Corp. v. Grand Premier Trust and Inv., Inc.*, 742 N.E.2d 351, 355 (Ill. App. Ct. 2000). Whether there is identity of cause of action is determined by a transactional analysis: "separate claims will be considered the same cause of action for purposes of *res judicata* if they arise from a single group of operative facts, regardless of whether they assert different theories of relief." *River Park, Inc.*, 703 N.E.2d at 893. "Whether a group of facts constitutes a transaction is 'to be determined pragmatically, giving weight to such considerations as whether the

facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.'" *Altair Corp.*, 742 N.E.2d at 355 (quoting *River Park, Inc.*, 703 N.E.2d at 893, quoting RESTATEMENT (SECOND) JUDGMENT § 24(2) (1982)).

As noted in numerous previous Orders, TAS I involved a claim that Cummins breached their contracts by failing to use reasonable efforts to develop, market and sell products containing its technology.  Neither this Court nor the Seventh Circuit Court of Appeals reached the merits of TAS' claims that the breach had occurred; rather, its claims were denied on the issue of damages.  *See TAS Distributing Co., Inc. v. Cummins Engine Company, Inc.*, 491 F.3d 625 (7th Cir. 2007).   In relevant part, the Complaint in TAS I (Doc. 236-20) specifically alleged that:

> 54.   From 1997 to the present time, Cummins has spent millions of dollars upgrading and updating its engine electronics, specifically, the ECM for its main lines of truck engines.
>
> 55.   At one point in time, Cummins placed TAS Technology (including the Temp-A-Start and Temp-A-Stop technology) in the ECM of at least three of its major lines of engines (specifically the "ISX" "ISM" and "Signature" lines).
>
> 56.   Subsequently, Cummins took the TAS Technology out of the ECM of its "ISX", "ISM" and "Signature" lines. (Doc. 236-20 p. 13).

In Counts I through VIII, TAS alleged that Cummins failed to maximize sales of either Original ECM Products or Retrofit Products utilizing the Temp-A-Start or the Temp-A-Stop Technology (Doc. 236-20 p. 15).  Counts IX through XII sought specific performance: that Cummins had a contractual obligation to "develop, manufacture and incorporate" TAS technology in its ECMs and to manufacture

Retrofit Products to "maximize royalties payable to TAS." From this Complaint, and the allegations made, it appears that TAS was under the impression that Cummins had essentially deleted all TAS technology from its ECMs.[17] It is further evident that TAS sought a declaration that Cummins was obligated to include TAS technology in its ECMs.

As indicated above, it is clear that TAS became aware, during discovery in TAS I that, in fact, Cummins ECMs *did* include TAS technology. TAS admits the following in response to Cummins' statement of material fact:

> 20. In his March 3, 2004 deposition in TAS I, Cliff Putteril, an employee of Cummins, testified regarding Cummins' Integrated ICON feature as follows:

>> Q: When you say 'in that form,' you're talking about the integrated ICON product?

>> A. Totally resident in the engine control module. The logic could be there, we just didn't have the pins available to access all of the requirements.

> (See Ex. 19, Putteril Dep. at 34:2-6.) (emphasis added.)

> **RESPONSE**: This paragraph is immaterial to any issues to be decided under the motions presently pending before the Court under Count 1. In the same deposition, Putterill of Cummins also testified that <u>as of March 4, 2004, the ECM's [sic] in Cummins' ISX and ISM engines still contained the ICON code (or software) in substantially the same form as that in the ECM's [sic] of Cummins' ISX and ISM engines in 1999.</u> According to Clifford Neil Putterril [sic] of Cummins, however, 'we just couldn't get to it (the ICON code) because of **no pins** . . . and we couldn't get to it.' (Dep. of Cummins' OEM Account

---

[17] Prior to commencement of TAS I, TAS claims, and Cummins does not dispute that Roe East, a past Director of Market Strategy and Pricing for Cummins, stated that "in order to meet the stringent EPA emissions regulations it was necessary 'to separate ICON from the engine control module.'" (Doc. 239, pp. 30-31, ¶ 1). Thus, TAS appears to have believed (prior to TAS I) that its technology, in the form of ICON was not contained in the ECM of certain Cummins' engines.

> Manager, Clifford Neil Putterill (given in his capacity as a corporate representative of Cummins designated pursuant to Rule 30(b)(6)), dated March 4, 2004, at pp. 142:19-143:17, Exhibit 'Y' hereto (emphasis added) [sic]. **Based on the above-quoted testimony and other evidence in TAS I, due to the lack of a single 'pin,' TAS reasonably believed that the ICON code in Cummins' engines was 'non-enableable' or 'inaccessible'.** TAS otherwise concedes the truth of the assertions contained in Paragraph 20 of Cummins' Statement of Undisputed Material Facts.

(Doc. 239, pp. 24-25 (bold emphasis in original, underlined emphasis added)).

In the present suit, TAS still alleges that Cummins breached its agreements and that it is owed royalties.  However, the basis for the breach is the complete opposite: instead of alleging that Cummins failed to include TAS Technology in its engines, TAS now alleges that Cummins in fact did include its technology but failed to pay it royalties.  TAS asserts that "Cummins has failed to pay royalties to TAS for the embodiment of TAS' technology in tens of thousands of the ISX and ISM engines (and perhaps other engine models as well) manufactured and sold by Cummins each year since at least 2005, perhaps earlier . . . ."  (Fifth Amended Complaint ¶ 9).

With the above finding in mind (with respect to the meaning of the contracts and the royalty-triggering event, that Cummins owed royalties on each engine that contained TAS technology), TAS' claims are barred by *res judicata* because it knew that Cummins' engines contained its technology even though such technology was thought to be inaccessible, during the pendency of TAS I.  That is, TAS knew, by its own admission as highlighted above, that ICON code was located in ISX and ISM engines (or indeed other Cummins engines).  The only thing that TAS didn't know then (or didn't reasonably believe based on Cummins' representations), was that the

ICON code could in fact be accessed through Pin 35 (or perhaps some other physical connection).  TAS' current posture in this lawsuit, perhaps in order to avoid the *res judicata* effect of its admission, is that the code must be "enableable" in order to trigger the royalties section.[18]  As indicated above, such a caveat is immaterial to whether Cummins owed royalties.  Under the plain terms of the contracts, the mere fact that TAS technology was located in a product is the royalty triggering event; whether such technology is accessible, enableable, or usable is irrelevant to the

---

[18] TAS states in its response to Cummins' Motion for Summary Judgment as to Count I:

> In claiming that Cummins' sale of engines with enableable ICON code is not a royalty event, Cummins constructs an argument around its assertion that "(w)hen distilled, TAS' argument is that Cummins allegedly breached § 5(b) of the parties' License Agreement simply because it included lines of code related to its Integrated ICON system on ISX and ISM engines equipped with a CM570 ECM." That, however, is not TAS' claim.
>
> If all Cummins had done was to sell engines that contained lines of ICON code that an OEM or downstream customers could **not** activate on its own, TAS would not have filed its Count I summary judgment motion. However, contrary to its statements in TAS I, it is indisputable that, from 2000 to the present, Cummins sold ISX and ISM engines equipped with the CM570 ECM that contained enableable ICON code through which an OEM, or its downstream customers, can activate an operating ICON System without further assistance from Cummins.

(Doc. 239, p. 36 (emphasis in original and citations omitted)).

While this may be TAS' argument now, that enableable TAS technology is the royalty triggering event, the Court rejects such a construction of the contracts at issue for the reasons set forth above.

royalties section.  Because TAS was aware in TAS I that its technology was located in Cummins' engines, it should have and could have sought royalties at that time.[19]

That TAS sought specific performance and sought royalties based on a different provision of the contract, and based on an erroneous understanding that its technology was not included in Cummins' engines and an erroneous understanding of what the royalty-triggering event was, is of little importance. "When a valid and final judgment rendered in an action extinguishes the plaintiff's claim . . . the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." RESTATEMENT (SECOND) OF JUDGMENTS § 24(1) (1982).  The claims in TAS I and this Count I (with respect to ICON) arose at the same time and are based on the same contract.  They would have comprised a convenient trial unit.  TAS' argument that it could not have pled opposite claims, that Cummins' engines did or did not contain its technologies, is without merit as the Federal Rules allow for alternative and inconsistent pleadings. *See* FED.R.CIV.P. 8(d).  To hold any differently would defeat the very purpose of *res judicata* and allow Plaintiff to "maintain another action based on a different theory, even though both actions were grounded upon the defendant's identical act or connected acts forming a single life-situation." RESTATEMENT (SECOND) OF JUDGMENTS at cmt. a.  Upon learning that Cummins' engines contained TAS

---

[19] TAS' argument that Cummins' misrepresentations would create an exception to *res judicata* is unavailing as to this particular claim.  There was no misrepresentation as to the salient fact: that Cummins' engines still contained ICON programming.  The misrepresentation was with respect to accessibility, which, the Court finds, is immaterial to the contracts at issue.

technology, for which TAS did not receive a royalty, during the pendency of TAS I, TAS should have and could have brought this claim. *Hicks v. Midwest Transit, Inc.*, 479 F.3d 468, 471 (7th Cir. 2007) ("*Res judicata* bars not only issues that were actually raised in the prior proceeding, but also issues which could have been raised in the prior proceeding); *Roboserve, Inc. v. KatoKagaku Co., Ltd.*, 121 F.3d 1027, 1034 (7th Cir. 1997) (same); *Hughey v. Industrial Commission*, 394 N.E.2d 1164, 1165-1166 (Ill. 1979) (noting that facts that are present and "in the exercise of ordinary diligence, could have been known at the time the original claim was filed" cannot lead to a new or different cause of action).

CONCLUSION

For the foregoing reasons, TAS' Motion for (partial) Summary Judgment with respect to Count I is DENIED and Cummins' Motion for Summary Judgment with respect to Count I is GRANTED IN PART and TAKEN UNDER ADVISEMENT IN PART.

TAS certainly makes out a claim that Cummins breached paragraph 5(b) of the License Agreement by failing to pay royalties on its ISX and ISM engines that contain the CM 570 ECM, which in turn contains TAS technology in the form of ICON computer programming. TAS also has made out a claim that it was damaged by this breach and has shown a sum certain of damages. However, TAS' claim is barred, as a matter of law, by *res judicata*.[20]

Cummins' Motion is granted to the extent that TAS' claim that Cummins breached the agreements by including TAS technology in its engines, as embodied by ICON, without paying a royalty is barred by *res judicata*. TAS could have and should have brought its claim in Count I, that Cummins' engines containing ICON computer programming are "Original ECM Products" for which Cummins owes a royalty, in TAS I. Cummins' Motion is taken under advisement to the extent that it claims that TAS' claims with respect to TAS technology being contained in the ISF

---

[20] TAS alludes to a claim that there may be *other* Cummins' engines, containing either a CM 570 ECM or other ECM, that may contain ICON programming code (and hence its technology), for which it has not been paid a royalty. The Court assumes that (now that discovery has closed) TAS would have specifically made such claims or included such claims in its assessment of damages outlined in its Motion for (partial) Summary Judgment. Therefore, this Court has no reservation in also finding that any such claims also are barred by *res judicata*: TAS could have and should have brought such claims in TAS I. This finding does not effect TAS claims, in Count I, with respect to the ISF Plus System.

Plus System also are barred by *res judicata*.  The Court will consider this claim along with Cummins' Motion with respect to Count III.


Entered this <u>5th</u> day of May, 2010


                           s/ Joe B. McDade
                    _____
                          JOE BILLY MCDADE
                    Senior United States District Judge