# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

TAS DISTRIBUTING COMPANY, INC.,  )
           )
     Plaintiff,         )
           )
        v.         )     Case No. 07-cv-1141
           )
CUMMINS, INC.,         )
           )
     Defendant.      )

## A M E N D E D   O P I N I O N and O R D E R

Before the Court are the Cross-Motions for Summary Judgment (Docs. 258 and 261) on the only remaining issue in this case, damages as to Count II of the Fifth Amended Complaint (Doc. 205).  For the reasons set forth below, Defendant's Motion is DENIED and Plaintiff's Motion is GRANTED.[1]

### INTRODUCTION

The Court assumes familiarity with the facts underlying the Fifth Amended Complaint.  In Count II, TAS accuses Cummins of failing to live up to its end of a bargain and pay royalties for each Retrofit Product sold by Cummins from April 1, 1998 to April 30, 2010.  In an Order dated March 30, 2009 (Doc. 141) this Court

---

[1] The original Order was issued on December 15, 2010 (Doc. 272) granting judgment in favor of TAS on Count II in the amount of $1,325,800 plus prejudgment interest. In footnote 16 of that Order, the parties were invited to check the Court's math and were also instructed to provide the Court with a prejudgment interest calculation. Both parties have responded (Docs. 275 and 278).  Cummins has provided both a more accurate statement of relevant sales and a prejudgment interest calculation. TAS has provided a prejudgment calculation ($378,569.00) that is $2001.00 different from Cummins' calculation ($376,568.00).  The Court adopts Cummins' calculation in light of the more accurate sales information provided.  This Order, then, reflects a change in sales figures and the inclusion of prejudgment interest.

found that Cummins breached the Intellectual Property License Agreement ("License Agreement") by failing to both provide monthly royalty compliance reports (as provided in section 6(e) of the License Agreement) and by failing to make royalty payments (as provided in section 5(a) of the License Agreement). At that time, the Court made no finding on actual damages. On December 10, 2009, however, this Court went on to find that according to section 6(c) of the License Agreement, Cummins is entitled to credit against "future royalty obligations" to the extent that the minimum royalty payments (which were paid during the first five years of the agreement) exceeded actual royalty payments (Doc. 217).

There is no dispute that Cummins made minimum royalty payments, in the amount of $1 million, during Years 1 through 5 of the License Agreement. There is also no dispute as to the number of retrofit units sold by Cummins. From April 1, 1998 to April 30, 2010, Cummins sold 13,681 such Retrofit Products.

The parties' dispute centers on whether sales of Original ECM Product[2] may be counted towards the minimum royalty offset that Cummins seeks. The parties also dispute whether TAS is entitled to prejudgment interest.

---

[2] In the May 5, 2010 Order [Doc. 253], this Court defined "Original ECM Product," as used in the License Agreement, as each engine manufactured by Cummins that contains the CM 570 ECM which in turn contains TAS technology in the form of computer programming, regardless of whether the technology could be accessed or used by an end-user. Cummins defines "Original ECM Product" as Integrated ICON, a fully functional, accessible, and usable product that is requested by an end-user. TAS defines "Original ECM Product" as any ECM that contains TAS technology that is accessible by an end-user. This Court's definition, of course, subsumes both TAS' and Cummins' definitions. Throughout this Order, when reference is made to "Original ECM Product," the Court is referring to its own definition unless otherwise indicated.

# BACKGROUND

The License Agreement between the parties has three sections that are relevant to the present Motions. Section 5(a) of the License Agreement provides that:

> From and after the Retrofit Stand-Alone Date, Licensee shall pay a royalty to Licensor for every Retrofit Product sold by Licensee, whether sold under the Cummins Brand or some other name, at the rate of: one hundred dollars ($100) per unit sold by Licensee in the first year commencing with the Retrofit Stand-Alone Date; one hundred and twenty-five dollars ($125) per unit sold by Licensee in the second year commencing with the first anniversary of the Retrofit Stand-Alone Date; and one hundred dollars ($100) per unit sold by Licensee in each year thereafter, commencing with the successive anniversaries of the Retrofit Stand-Alone Date. Royalties shall be paid on a monthly basis, with the first month beginning on the Retrofit Stand-Alone Date, within thirty (30) days after the close of each month.

Section 5(b) contains a royalty obligation with respect to the Original ECM Product that is based not on year but rather on number of units sold.[3] Both parties appear to agree that the "Retrofit Stand-Alone Date" referenced in the License agreement refers to March 31, 1998.[4] From April 1, 1998 to March 31, 1999, Cummins sold no Retrofit Products (Doc. 260, p. 5). From April 1, 1999 to March 31, 2000, Cummins

---

[3] Cummins states that it sold 976 Original ECM Products (which it terms "Integrated ICON Products"—the fully functional ICON product with the necessary attachments, switches, and relays necessary for use) from March, 1998 to April 2003. This would have generated $97,600 in royalties to TAS. According to Rich Thielmeyer, Cummins discontinued sales of Integrated ICON Products at the end of 2002. (Doc. 225, ¶ 32). Section 5(b) of the License Agreement provides that, for any given year, Cummins owed a $100 royalty on the first 2500 Original ECM Products sold and $50 for each such product sold thereafter.

[4] This phrase is defined in the Master Agreement as "the date on which licensee first commences production of the Cummins-Brand Stand-Alone Retrofit Product." (Doc. 236-2, p. 10).

sold 752 Retrofit Products (*Id*.). From April 1, 2000 to April 30, 2010, Cummins

sold 12,929 Retrofit Units (TAS' Statement of Undisputed Material Facts (TSUMF)

3).[5] Based on Section 5(a) of the License Agreement (alone), this amount would

have generated $1,386,900 in royalty payments over this time period (April 1, 1998

to April 30, 2010).[6]

Section 6(a) of the License Agreement covers minimum royalty obligations.

The section provides:

> Licensee covenants and agrees that, if Licensee shall have any of the
> rights granted to Licensee in Sections 3 and 4 of this License
> Agreement with respect to any of the Subject Technology or Related
> Intellectual Property, Licensee shall make, for each of the five (5) years
> commencing with the later of July 1, 1997 or the Decision Date in the
> Pending TAS Action or though [sic] settlement with DDC (the "Royalty
> Commencement Date"), either (i) actual royalty payments of at least a
> total of the minimum royalty payments to Licensor according to the
> schedule below; or, if Licensee does not generate sufficient sales to
> meet the minimum royalty payments, (ii) payments within 30 days
> after the close of each year in addition to actual royalty payments for a
> total of the minimum royalty payments according to the schedule
> below.

|  Schedule of Minimum Royalty Payments | |
|---|---|
| Year 1 | $100,000 |
| Year 2 | $300,000 |
| Year 3 | $200,000 |
| Year 4 | $200,000 |
| Year 5 | $200,000 |

---

[5] It is undisputed that from April 1, 1998 to December 31, 2008, Cummins sold
12,890 Retrofit Products and from January 1, 2009 to April 30, 2010 Cummins sold
791 Retrofit Products. The total of these two amounts, 13,681, minus the amount
sold from April 1, 1999 to March 31, 2000 (752 Retrofit Products subject to a royalty
of $125 per unit) leaves 12,929 subject to a $100 per unit royalty.

[6] TAS' figure is $1,373,775. It is unclear how TAS arrived at this number. The
Court figures that 752 times $125.00 plus 12,929 times $100.00 equals the amount
shown above.

It is undisputed that the minimum royalty obligation period began on March 31, 1998 and ran through April 1, 2003. It is further undisputed that Cummins paid the $1,000,000 minimum royalty obligation consistent with the terms of the License Agreement. During this same time period, Cummins sold 1,339 Retrofit Products (752 of which were sold from March 31, 1999 to April 1, 2000 – at the higher $125 per product rate). The total actual royalty amount for Retrofit Products during this time period is $152,700.00 (March 31, 1998 to April 1, 2003).

The final relevant section is 6(c):

> To the extent that minimum royalty payments made by Licensee exceed actual royalties paid by Licensee in a given year, such payments above and beyond actual royalties shall be credited against Licensee's future royalty obligations, provided that Licensee shall make the requisite yearly minimum payments specified in sections [sic] 6(a) of this Agreement.

Of particular relevance is that this section is silent as to whether the credit would go to royalty payments for the Retrofit Product and/or the Original ECM Product.

There is no dispute that Cummins paid royalties in the amount of $13,200 for 132 Retrofit Products sold in April and May, 2003 (TSUMF 2). There is also no dispute that Cummins offered $136,225 to TAS on November 16, 2007, $28,467.50 on December 21, 2007, and $392,000 on July 10, 2009, adding up to a total of $556,692.50, as additional payment for any unpaid royalties it may owe on the sale of Retrofit Products. TAS refused to accept the payment.

## STANDARD

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the responsibility of informing the Court as to portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the movant has met its burden, to survive summary judgment the "nonmovant must show through specific evidence that a triable issue of fact remains on issues on which [s]he bears the burden of proof at trial." *Warsco v. Preferred Tech. Group*, 258 F.3d 557, 563 (7th Cir. 2001); *See also Celotex Corp.*, 477 U.S. at 322-24. "The nonmovant may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; it must go beyond the pleadings and support its contentions with proper documentary evidence." *Chemsource, Inc. v. Hub Group, Inc.*, 106 F.3d 1358, 1361 (7th Cir. 1997).

This Court must nonetheless "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]." *Holland v. Jefferson Nat. Life Ins. Co.*, 883 F.2d 1307, 1312 (7th Cir. 1989). In doing so, this Court is not "required to draw every conceivable inference from the record -- only those inferences that are reasonable." *Bank Leumi Le-Isreal, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991). Therefore, if the record before the court "could not lead a rational trier of fact to find for the non-moving party," then no genuine issue of

material fact exists and, the moving party is entitled to judgment as a matter of law. *McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 796 (7th Cir. 1997) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). However, in ruling on a motion for summary judgment, the court may not weigh the evidence or resolve issues of fact; disputed facts must be left for resolution at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

## DISCUSSION

As indicated above, the parties dispute centers around the total royalties due and owing TAS as of April 30, 2010, the dollar amount of the minimum royalty credit that Cummins is entitled to, and whether TAS is entitled to prejudgment interest.

## I. Contractual Credit and Amount Owed by Cummins to TAS

TAS argues that Cummins is entitled to no minimum royalty credit because the actual royalties due on the sale of Retrofit *and* Original ECM products exceed the minimum royalty payments made by Cummins. To support this argument, TAS points out that from April, 2000 to February, 2010, Cummins sold 195,128 ISX and ISM engines "that contained ICON code that could be enabled by an OEM." TAS further points out that this figure is conservative in light of this Court's conclusion that the engine ECM's, themselves, are "Original ECM Products" that would presumably generate a royalty to TAS. TAS does not specifically refer to sales data for the entire minimum royalty time period, March 31, 1998 to April 1, 2003; however, for the years 2000 to 2003, Cummins sold 37,241, 24,320, 28,937, and

7,806 Original ECM Products, respectively. These sales would have generated $5,181,430 in royalty payments[7], which, coupled with the sales and royalties on the Retrofit Products during the same time period, exceed the minimum royalty amount paid by Cummins. According to TAS' calculations, Cummins therefore owes $1,360,575 in royalty payments for Retrofit Products sold.[8]

Cummins on the other hand, argues that any royalties with respect to Original ECM Products cannot count to towards the minimum royalty credit because TAS is barred from making such claims by this Court's prior Order. According to Cummins, actual sales of the Retrofit Products and Integrated ICON from April 1998 to 2003 equaled 2,315 (1,339 and 976, respectively). This would have generated $250,300 in royalties to TAS during that time period ($152,700 and $97,600, respectively). Cummins then concludes that because it paid the $1,000,000 minimum royalty amount from April 1998 to April 2003 and it owed only $250,300 in actual royalties on Retrofit Products and Integrated ICON, it was entitled to a credit of $749,700 against all royalties due after April 1, 2003. This amount ($749,700), coupled with actual royalties paid after April 1, 2003, $13,200, when subtracted from the total amount of actual royalties due on Retrofit Products sold

---

[7] As noted above, section 5(b) of the License Agreement provides that for any given year, Cummins would pay royalties in the amount of $100 for the first 2500 Original ECM Products sold and $50 for each unit sold thereafter.

[8] As indicated above, the Court's calculation differs. If Cummins owes $1,386,900 for Retrofit Products sold from April, 1998 to April, 2010, and it paid $13,200 for Retrofit sold in April and May 2003, then the remaining royalty amount that would be due and owing to TAS, according to its theory, would be $1,373,700.

from April 2003 to April 2010 (that is, after the minimum royalty period)[9] would generate the amount of $471,300 due and owing to TAS.

The Court finds TAS' argument persuasive: Merely because it is barred from seeking relief from this Court and recovering royalties on Count I does not negate the terms of the contract which call for royalties on Original ECM Products and for those royalties to be included in the offset occasioned by the credit that Cummins may be entitled to pursuant to Section 6(c) of the License Agreement.

The doctrine of *res judicata* bars subsequent litigation on a claim that has already been adjudicated. *See Altair Corp. v. Grand Premier Trust and Inv., Inc.*, 742 N.E.2d 351, 355 (Ill. App. Ct. 2000). The justification for the doctrine is to prevent a defendant from being harassed by multiple suits and to conserve resources that would be expended on duplicative lawsuits. *Id.* The Court is unaware of any authority that would bar TAS from recovering damages on a claim that is not found barred by *res judicata* even though those damages must be calculated using the potential damages of a claim that is barred by *res judicata*. In addition, as far as the Court is aware, the issue of what sales of Retrofit or Original ECM Products would be subject to the credit contained in section 6(c) of the License Agreement has never been litigated such that issue preclusion would apply. Merely because TAS is barred from *filing suit* to recover damages related to the Original ECM Product does not prevent it from using those damages in calculating the amount due, pursuant to the License Agreement, on the sale of Retrofit Products.

---

[9] Cummins indicates that it sold 12,342 Retrofit Products from April 1, 2003 to April 30, 2010. This would entitle TAS to $1,234,200 in royalties during that time period for Retrofit Products sold.

Cummins goes on to argue that the phrase "actual royalties paid" in section 6(c) of the License Agreement would prevent TAS from asserting that actual royalties that are due, but not paid, are also subject to the credit. As quoted above, the section 6(c) License agreement provides that:

> To the extent that minimum royalty payments made by Licensee exceed actual royalties paid by Licensee in a given year, such payments above and beyond actual royalties shall be credited against Licensee's future royalty obligations, provided that Licensee shall make the requisite yearly minimum payments specified in section 6(a) of this Agreement.

Cummins' construction of this section, and, in particular, the weight given to the word "paid" would not be in accordance with the intent of the parties. In construing a contract, the Court is required to give meaning to the intent of the parties as evidenced by the language contained in an unambiguous contract. *Buenz v. Frontline Transp. Co.*, 882 N.E.2d 525, 528-529 (Ill. 2008) ("The Cardinal rule of contract interpretation is to discern the parties' intent from the contract language."). Section 5 of the License Agreement mandates the payment of actual royalties on a monthly basis. The parties must have intended, then, that any such credit that Cummins would be entitled to pursuant to section 6(c) necessarily would take into account those actual royalty payments that Cummins should have made. As aptly stated by the Illinois Court of Appeals many years ago:

> The argument of the defendant is based largely upon the first clause in the agreement, viz: "In consideration of your having secured," etc. In *Walker v. Douglas*, 70 Ill. 445 [1873 WL 8626 (Ill. 1873)], it is said to be a familiar elementary principle of construction that it is the duty of the court to discover and give effect to the intention of the parties, so that performance of the contract may be enforced according to the sense in which they mutually understood it at the time it was made; and where

the intention of the parties to the contract is sufficiently apparent, effect must be given to it in that sense, though violence be done thereby to its words. The mere use of the past tense in the form should not blind us to the actual intent of the parties. *Roberts v. Howe*, 178 Ill. App. 1, 1913 WL 2084, *2 (Ill. App. Ct. 1913).

It is apparent that TAS and Cummins intended the credit to extend to the actual royalty payments that Cummins owed TAS, regardless of whether those royalties were paid in a timely manner by Cummins. The mere use of the word "paid" and the meaning attributed to this word does not blind this Court to the actual intent of the parties as evidenced by the contract as a whole.

In light of the foregoing, then, Cummins is entitled to credit only to the extent that the minimum royalty obligation for a given year exceeded the actual royalty amount that was due and owning on sales of both the Retrofit Product and the Original ECM Product (as defined by Cummins and the Court) for that year. According to Cummins' Exhibit 1A the following table represents sales of Retrofit and Original ECM Products sold during the first five years of the agreement (April 1, 1998 to March 31, 2003):

**Chart 1**

| Year | Retrofit Products Sold | Original ECM Products Sold (as defined by Cummins) |
|------|------------------------|---------------------------------------------------|
| Year 1 | 0 | 0 |
| Year 2 | 752 | 0 |
| Year 3 | 227 | 71 |
| Year 4 | 88 | 220 |
| Year 5 | 272 | 685 |
| **TOTAL:** | **1339** | **976** |

(Doc.264, pp. 6-7)[10].

According to TAS, the following Chart 2 represents sales of additional Original ECM Products:[11]

**Chart 2**

| Year | Original ECM Products sold (as defined by the Court) |
|---|---|
| Year 1 | 0 |
| Year 2 | 9,310 |
| Year 3 | 33,989 |
| Year 4 | 25,406 |
| Year 5 | 23,655 |

(Doc. 260, p. 48).

When Charts 1 and 2 are combined, Chart 3 represents the total sales of Retrofit and Original ECM Products:

---

[10] Schedule 9.3 lists the sale of products that are either labeled "retrofit kit," "first fit," or "Integrated ICON" for each given calendar year. There is no dispute that "retrofit kit" and "first fit" refer to sales of the Retrofit Product. There is also no dispute that "Integrated ICON" refers to sales of the Original ECM Product. Sales are further separated into two time blocks, January through March and April through December.

[11] TAS does not provide these numbers according to the "year," April 1 to March 31, that is used in the License Agreement. Rather, TAS provides numbers for each calendar year beginning in 2000. In order to avoid delay, the Court has divided each year's amount by 12 and recalculated according to the April 1 to March 31 timeframe.

**Chart 3**

| Year | Retrofit Products Sold | Original ECM Products Sold | TOTAL |
|---|---|---|---|
| Year 1 | 0 | 0 | **0** |
| Year 2 | 752 | 9,310 | **10,062** |
| Year 3 | 227 | 34,060 | **34,287** |
| Year 4 | 88 | 25,626 | **25,714** |
| Year 5 | 272 | 24,340 | **24,612** |
| **TOTAL** | **1,339** | **93,336** | |

According to the royalty schedule outlined in section 5 of the License Agreement,[12]

the following royalties would be payable on the sales listed in Chart 3:

**Chart 4**

| Year | Royalties Due on Retrofit Products Sold | Royalties Due on Original ECM Products Sold |
|---|---|---|
| Year 1 | $0 | $0 |
| Year 2 | $94,000 | $590,500 |
| Year 3 | $22,700 | $1,828,000 |
| Year 4 | $8,800 | $1,406,300 |
| Year 5 | $27,200 | $1,342,000 |
| **TOTAL** | **$152,700** | **$5,166,800** |

The total actual royalties due for each year is thus:

---

[12] As to Retrofit Products, Cummins owed $100 for each Retrofit Product sold in Years 1, 3, 4, and 5 and $125 for each Retrofit Product sold in Year 2. As to Original ECM Product, Cummins owed $100 for the first 2,500 Original ECM Products sold and $50 for each product sold thereafter for any given year.

**Chart 5**

| Year | Actual Royalties Due |
|------|---------------------|
| Year 1 | $0 |
| Year 2 | $684,500 |
| Year 3 | $1,850,700 |
| Year 4 | $1,415,100 |
| Year 5 | $1,369,200 |

According to Section 6(c), Cummins is entitled to a credit "against [its] future royalty obligation" of minimum royalties that exceed actual royalties, in a given year, *provided that Cummins makes the "requisite yearly minimum payments . . ."* Therefore, to the extent that Cummins is entitled to a credit, it can only be used after it has paid the minimum royalty amount of $1,000,000; i.e. it can only be applied after the minimum royalty period ends, after Year 5.  As can be seen from Chart 6, the only year that the minimum royalty payments "exceed actual royalties paid" by Cummins is Year 1:

**Chart 6**

| Year | Actual Royalties Due | Minimum Royalties Paid |
|------|---------------------|------------------------|
| Year 1 | $0 | $100,000 |
| Year 2 | $684,500 | $300,000 |
| Year 3 | $1,850,700 | $200,000 |
| Year 4 | $1,415,100 | $200,000 |
| Year 5 | $1,369,200 | $200,000 |

Therefore, Cummins is only entitled to a $100,000 credit which will be applied after the minimum royalty payment period ends provided that Cummins made the requisite minimum royalty payments, which the parties agree it did.  The next item that must be determined is how much Cummins owes TAS for Retrofit Products

sold during the minimum royalty period when the payments made by Cummins are taken into account. The following chart represents the amount that Cummins owed TAS for each year:

**Chart 7**

| Year | Actual Royalties Due | Minimum Royalties Paid | Amount Owed |
|------|---------------------|------------------------|-------------|
| Year 1 | $0 | $100,000 | $0 |
| Year 2 | $684,000 | $300,000 | $384,000 |
| Year 3 | $1,850,700 | $200,000 | $1,650,700 |
| Year 4 | $1,415,100 | $200,000 | $1,215,100 |
| Year 5 | $1,369,200 | $200,000 | $1,169,200 |

Because the License Agreement does not provide a specific manner in which credit or payments should be applied to sales of both the Retrofit and the Original ECM Products, logic dictates that the credit would be applied proportionally on each sale. For example, in Year 2, Retrofit Products represented 7.5% of total sales.[13] It would seem to the Court, then, that 7.5% of the credit and payments should be applied to that years' sale of Retrofit Products. The following chart represents the number of Retrofit Products sold as a percentage of the total number of products sold for each year.

---

[13] In Chart 3, it will be noted that in Year 2, 752 Retrofit Products were sold and 9,310 Original ECM Products were sold for a total of 10,062. 752 Retrofit products represents 7.5% (which is a rounded figure) of the total number of products sold in that year.

**Chart 8**

| Year | Number of Retrofit Products | Total Products Sold | Retrofit Products Sold as % of Total |
|------|------|------|------|
| Year 1 | 0 | 0 | |
| Year 2 | 752 | 10,062 | 7.5% |
| Year 3 | 227 | 34,287 | 0.7% |
| Year 4 | 88 | 25,714 | 0.3% |
| Year 5 | 272 | 24,612 | 1.1% |

Applying the percentage to the payments made each year provides the proportional amount of the payments that can be applied to the royalties due on sale of the Retrofit Products:

**Chart 9**

| Year | Retrofit Products Sold as % of Total | Amount Paid | Amount to be Credited to Retrofit Products Sold | Actual Royalties Due on Retrofit Products | Difference: Royalties Due and Owing |
|------|------|------|------|------|------|
| Year 1 | 0 | $100,000 | $0 | $0 | $0 |
| Year 2 | 7.5% | $300,000 | $22,500 | $94,000 | $71,500 |
| Year 3 | 0.7% | $200,000 | $1,400 | $22,700 | $21,300 |
| Year 4 | 0.3% | $200,000 | $600 | $8,800 | $8,200 |
| Year 5 | 1.1% | $200,000 | $2,200 | $27,200 | $25,000 |
| | | | | **TOTAL:** | **$126,000** |

For Years 1 through 5, Cummins owed TAS $126,000 in royalties for Retrofit Products Sold.

Next, the minimum royalty credit must be applied since Cummins is entitled to a $100,000 credit towards royalties due on Retrofit and Original ECM Products[14] sold in Year 6 (and onward).

In Year 6 (April 1, 2003 to March 31, 2004), Cummins sold a total of 1,982 Retrofit Products. Also in Year 6, Cummins sold 8,448 Original ECM Products.[15] Chart 10 represents the royalties owed on those amounts in Year 6:

**Chart 10**

|  | Amount Sold | Royalties Due |
|---|---|---|
| Retrofit Products | 1,982 | $198,200 |
| Original ECM Products | 8,448 | $547,400 |
| **TOTAL:** | **10,430** | |

Retrofit Products accounted for 19.0% of the total products sold in Year 6. Applying the $100,000 credit proportionally to the number of Retrofit Products (in the same manner as Chart 9) reveals that $19,000 of the $100,000 credit should be applied to the royalties due on Retrofit Products sold in Year 6. This amount, $19,000, coupled with the $13,200 that Cummins paid for Retrofit Products sold in April and May, 2003, and subtracted from the total amount due ($198,200) equals $166,000. After Year 6, Cummins owed the full amount of royalties on each Retrofit Product

---

[14] As stated above, Cummins did not sell any Integrated ICON products that are fully functional and accessible, after December, 2002.

[15] TAS' Ex F shows that in 2003 Cummins sold 7,806 Original ECM Products and in 2004 Cummins sold 10,376 Original ECM Products. Using the same method as footnote 11, Cummins therefore sold 5854 Original ECM Products from April 1, 2003 through December 31, 2003 and 2594 Original ECM Products from January 1, 2004 to March 31, 2004.

Sold. Chart 11 represents the total amount of royalties due on Retrofit Products sold from April, 1, 1998 to April 30, 2010.

**Chart 11**

| Date | Retrofit Products Sold | Royalties Due |
|---|---|---|
| April 1, 1998 to March 31, 2003 | 1339 | $126,000 |
| April 1, 2003 to March 31, 2004 | 1982 | $166,000 |
| April 1, 2004 to April 30, 2010 | 10,360 | $1,036,000 |
| **TOTAL** | **13,681** | **$1,328,000** |

It is the finding of this Court that Cummins owes $1,328,000 in royalties to TAS on the sale of Retrofit Products sold by Cummins from April 1, 1998 to April 30, 2010.

## II. Prejudgment Interest

Illinois' Interest Act provides:

Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill . . .or other instrument of writing . . . and on money withheld by an unreasonable and vexatious delay of payment.

815 Ill. Comp. Stat. § 205/2.

An award of interest is within the discretion of the Court. *Illinois Health Maintenance Organization Guar. Ass'n v. Shapo*, 826 N.E.2d 1135, 1157 (Ill. App. Ct. 2005); *Marcheschi v. Illinois Famers Ins. Co.*, 698 N.E.2d 683, 688-689 (Ill. App. Ct. 1998). Prejudgment interest can be awarded when the amount is easily computed. *New Hampshire Ins. Co. v. Hanover Ins. Co.*, 696 N.E.2d 22, 28 (Ill. App.

Ct. 1998). However, "[w]hen a written instrument establishes an amount due and the time for payment, the creditor has a right to interest." *Milligan v. Gorman*, 810 N.E.2d 537, 541 (Ill App. Ct. 2004). Neither party suggests that the contract at issue is not an "instrument of writing" as used by the Act. *See PPM Finance, Inc. v. Norandal USA, Inc.*, 392 F.2d 889, 895 (7th Cir. 2004) (noting three elements: "(1) a written instrument that establishes indebtedness; (2) a specific or inherent due date; and (3) that the indebtedness is subject to easy calculation.").

The parties' main argument centers on whether there is a "good faith" exception to the award of prejudgment interest under the Act. Cummins relies on *Liu v. Price Waterhouse LLP*, 302 F.3d 749, 757 (7th Cir. 2002) for the proposition that "if payment is being withheld in good faith, because of a genuine and reasonable dispute, interest will not be awarded." *Id.* at 757. In so finding, the Seventh Circuit relied on *Gen. Dynamics Corp. v. Zion State Bank & Trust Co.*, 427 N.E.2d 131, 134 (Ill. 1981) and the limitation contained in *Weidner v. Szostek*, 1614 N.E.2d 879 (Ill. App. Ct. 1993). In *Zion State Bank*, the Illinois Supreme Court held that a good faith dispute as to the terms of a contract would disallow prejudgment interest. *Id.* at 133-134. *Weidner* limited the holding in *Zion State Bank* to instances when a prejudgment interest claim is statutory rather than contractual. Importantly, both *Liu* and *Zion State Bank* cite to that portion of the Act where prejudgment interest is sought because of "unreasonable and vexatious delay in payment." *See Liu*, 302 F.3d at 757; *Zion State Bank*, 427 N.E.2d at 133.

Naturally, a good faith dispute would belie any claim that payment was unreasonably withheld.

In this case, however, TAS seeks damages pursuant to the "written instrument" portion of the Act. Cummins has presented no direct authority that a "good faith" exception would apply to that section of the Act. Indeed, the cases cited above indicate that prejudgment interest should be awarded in instances such as this; and, certainly, the award of such interest is within the discretion of this Court.

The Court finds that prejudgment interest should be awarded for a number of reasons. First, Cummins was aware, at least from October, 2005 (the date that Cummins claims the credit ran out), that it owed TAS for the sale of Retrofit Products sold. Notwithstanding this knowledge, Cummins did not tender a check until November 16, 2007, some two years later, and coupled that tender with a "request" the TAS dismiss Counts I and II of the lawsuit. Cummins clearly owed royalties on Retrofit Products sold such that coupling its payment obligation with a request, no matter how worded, is not what the Court would consider "good faith." Second, Cummins' tender of two additional checks does not cover the amount due and owing as found by this Court. Finally, the award of prejudgment interest will give effect to the purpose of the Act: to fully compensate TAS for its loss and to place it in the same position had Cummins lived up to its end of the bargain in a timely manner. *See e.g. PPM Finance, Inc.*, 392 F.3d at 895; *Neumann v. Neumann*, 777 N.E.2d 981, 985 (Ill. App. Ct. 2002)).

The parties have provided prejudgment calculations that are consistent with this Order. The Court adopts Cummins' calculation because it represents an accurate accounting of the sales of Retrofit Products for each given year (which in turn would directly effect the calculation of interest). Accordingly, TAS is awarded $376,568.00 in prejudgment interest.

## CONCLUSION

For the foregoing reasons, Defendant's Motion (Doc. 261) is DENIED and Plaintiff's Motion (Doc. 258) is GRANTED.[16]

TAS is awarded $1,328,000.00 plus $376,568.00 in prejudgment interest, for a total of **$1,704,568.00** on Count II of the Fifth Amended Complaint (Doc. 205).

The Clerk of Court is DIRECTED to withhold the entry of judgment in this matter until so directed by the Court.

Entered this <u>10th</u> day of January, 2011

s/ Joe B. McDade
JOE BILLY MCDADE
United States Senior District Judge

---

[16] Plaintiff's Summary Judgment Motion is granted with the caveat that the requested amount, $1,360,575, has been reduced by the Court.