UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| TAS DISTRIBUTING COMPANY, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 07-cv-1141 |
| | ) |
| CUMMINS, INC., | ) |
| | ) |
| Defendant. | ) |

## O P I N I O N and O R D E R

This matter is before the Court on the Motion for Summary Judgment as to Count III of the Fifth Amended Complaint filed by Defendant, Cummins, Inc., on December 18, 2009 (Doc. 219). As held in this Court's previous Order of May 18, 2010, an earlier replica of this Motion was granted on *res judicata* grounds. (Doc. 254). That holding was modified to note that the Motion was granted in part and taken under advisement in part in light of this Court's September 1, 2011 Order clarifying certain holdings. (Doc. 287). The Court will now address the merits of Count III of the Fifth Amended Complaint. For the following reasons, Cummins' Motion for Summary Judgment as to Count III of the Fifth Amended Complaint (Doc. 219) is DENIED.

Count III, pled as an "alternative" to Count I, is based on motions and evidence compiled in this very case and is another claim similar to TAS' claim made in *TAS I* that Cummins failed to use reasonable efforts to market and sell TAS technology. TAS specifically alleges that, based on Cummins' Cross Motion for

1

Summary Judgment as to Count I (filed on December 21, 2007), Cummins has asserted that it independently created technology (which TAS labels "enhanced proprietary idle shutdown technology") that would perform the same function as TAS technology (shutting down electronic accessories to save battery power). Cummins introduced this technology in late 1998 or 1999 in ISX and ISM engines. This technology has been labeled by the Court in previous Orders as the "ISF Plus System": it is an accessory shutdown feature that Cummins added to the Electronic Control Modules (ECMs) of the engines it manufactured. Thus, TAS alleges that Cummins' technology directly competes with TAS' technology and Cummins is using its technology in its engines in lieu of TAS' technology. This, TAS claims, is an indication that Cummins is not using reasonable efforts to market and sell TAS technology, which constitutes a violation of Section 6(f) of the License Agreement. TAS claims that Cummins owes royalties that it would have paid had Cummins incorporated TAS technology instead of its own technology.

## BACKGROUND

The ISF Plus System shuts down an engine (by cutting off power to fuel injectors) after the engine has been idling for a set period of time. The ISF Plus System also shuts down certain vehicle accessories. The ISF Plus System is not sold as a separate system but is contained in the ECM of the engine—Cummins does not charge a separate fee for the system. The ISF Plus System with the accessory shutdown feature has been included in Cummins' engines since at least 1997.

As indicated above, Count III alleges that Cummins did not use reasonable efforts to market and sell TAS technology (specifically Temp-A-Stop), in violation of the License Agreement, by selling and marketing the ISF Plus System. TAS generally contends that by selling or providing the ISF Plus System, Cummins is directly competing with TAS' technology, which also shuts down accessories under certain circumstances.

In order to permit a clear understanding of this litigation and the context for disposition of the pending summary judgment motion, reference must be made to the decision of the Court of Appeals in *TAS I* affirming this Court's earlier disposition of a summary judgment motion involving this same contract provision. The appellate court described this litigation as follows:

> This case arises out of an agreement between TAS Distribution Company, Inc. ("TAS") and Cummins Engine Company, Inc. ("Cummins"). In that agreement, TAS granted Cummins a co-exclusive license to use its idle-control technology for heavy-duty truck engines. The agreements required Cummins to "make all reasonable efforts to market and sell" the licensed products in an effort to maximize royalties payable to TAS. TAS, believing that Cummins was not making "all reasonable efforts," filed this action in the Central District of Illinois. The complaint set forth twelve counts, including claims for breach of contract and for specific performance. At the close of discovery, Cummins moved for summary judgment, and TAS cross-moved for partial summary judgment (relating specifically to Cummins' failure to market one particular product, the "Temp-A-Stop" Product). The district court granted Cummins' motion for summary judgment and denied in part and granted in part TAS' cross-motion.

*TAS Distributing Co., Inc. v. Cummins Engine Co., Inc.*, 491 F.3d 625 (7th Cir. 2007). In *TAS I*, TAS specifically alleged (in its motion for partial summary

judgment) that Cummins was not using "reasonable efforts" to market and sell licensed products by failing to develop a separate Temp-A-Stop system (that is, a "two box product" that included only Temp-A-Stop and that is not contained in an engines' ECM). These actions, TAS alleged, violated Section 6(f) of the License Agreement. In Cummins' motion for summary judgment, it generally alleged that TAS failed to show that it did not use "reasonable effort," and that in any event TAS cannot show damages. Cummins indicated that the contracts did not call for the development of a standalone Temp-A-Stop system and that both Temp-A-Start and Temp-A-Stop were included in its ICON product.

In ruling on the Motions, this Court did not specifically address TAS' assertion that Cummins failed to develop an independent Temp-A-Stop system (and thus failed to use reasonable efforts in that particular regard), and instead focused on the general proposition that Cummins failed to use reasonable efforts to market and sell TAS technology. In considering liability, this Court held that it was a question of fact whether or not Cummins was using reasonable efforts to market and sell TAS technology. However, the Court went on to find that TAS' damages claims were too speculative to warrant judgment in its favor and in fact warranted judgment in Cummins' favor. In so ruling, this Court considered and rejected two pieces of evidence offered by TAS: pre-contract negotiations in which Cummins estimated that it could sell a certain amount of units; and an unverified affidavit that a competing company, Detroit Diesel, actually sold a certain number of units.

The Seventh Circuit also considered the sales of Detroit Diesel and Cummins' estimated sales. With respect to the former, the court stated that Illinois "New Business Rule" provided guidance and found that damages based on Detroit Diesel's sales were too speculative. *Id.* at 635. With respect to the latter basis of damages—pre-contractual negotiations—the court found that the "four corners rule" prevented consideration of extrinsic evidence regarding projected sales. *Id.* at 636-37. Thus, the court held that TAS failed to present any evidence upon which damages could be calculated. *Id.*

In so ruling, the Seventh Circuit noted that under Illinois law, damages for a breach of contract require (1) proof that plaintiff sustained damages, and (2) a reasonable basis for computing those damages. *Id.* at 632. With respect to lost profits, the court stated that

> lost profits will be allowed only if: their loss is proved with a reasonable degree of certainty; the court is satisfied that the wrongful act of the defendant caused the lost profits; and the profits were reasonably within the contemplation of the defaulting party at the time the contract was entered into.

*Id.* at 632. The court then noted that "as a general rule, expected profits of a new commercial business are considered too uncertain, specific and remote to permit recovery"—a proposition labeled the "New Business Rule," which also applies to new products. *Id.* at 633. The court then considered all of these principles in finding that TAS' attempt to show damages was too speculative. In particular, with respect to the sales by Detroit Diesel, the court stated that the New Business Rule was "relevant" in that it provides that lost profits can be determined by comparable

5

"past profits in an established business, but that the lost profits of a new business would be too speculative on which to base recovery"—a proposition that applies with equal force to new products. *Id.* (citations omitted). The court found that the product sold by Detroit Diesel was inherently different from Cummins' ICON product and therefore the New Business Rule and Illinois law regarding damages rendered speculative any comparison between the two. Further, the court reasoned that there was nothing in the record tending to suggest that Cummins could have sold as many products as Detroit Diesel, establishing the latter's precise role in the engine market, or tending to establish that Detroit Diesel and Cummins are sufficiently comparable companies to warrant imputing Detroit Diesel's engine sales to Cummins. Additionally, the court found that TAS' proof on the subject did not prove damages to a reasonable degree of certainty. *Id.* at 635. The Seventh Circuit finally noted that evidence of pre-contract projected sales could not be considered as proof of damages because of the four corners rule applied to integrated contracts. *Id.* at 637.

TAS' Count III claim again raises the issue of whether Cummins has breached the "all reasonable efforts" clause. This time, TAS alleges that Cummins is selling engines equipped with its ISF Plus System in place of engines utilizing TAS' Temp-A-Stop product. TAS explicitly assumes (for the purposes of Count III only) "that Cummins developed the ISF Plus System prior to signing the License Agreement and independent of TAS . . . ." (Doc. 205 at 13, ¶ 66).

6

**DISCUSSION**

**I. Standard**

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party has the responsibility of informing the Court as to portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the movant has met its burden, to survive summary judgment the "nonmovant must show through specific evidence that a triable issue of fact remains on issues on which he bears the burden of proof at trial." *Warsco v. Preferred Tech. Group*, 258 F.3d 557, 563 (7th Cir. 2001); see also *Celotex Corp.*, 477 U.S. at 322-24. "The nonmovant may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; it must go beyond the pleadings and support its contentions with proper documentary evidence." *Chemsource, Inc. v. Hub Group, Inc.*, 106 F.3d 1358, 1361 (7th Cir. 1997).

This Court must nonetheless "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]." *Holland v. Jefferson Nat. Life Ins. Co.*, 883 F.2d 1307, 1312 (7th Cir. 1989). In doing so, this Court is not "required to draw every conceivable inference from the record—only those

7

inferences that are reasonable." *Bank Leumi Le-Isreal, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991). Therefore, if the record before the court "could not lead a rational trier of fact to find for the non-moving party," then no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. *McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 796 (7th Cir. 1997) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). However, in ruling on a motion for summary judgment, the court may not weigh the evidence or resolve issues of fact; disputed facts must be left for resolution at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

### II.  Analysis

In its Motion, Cummins argues that it should be granted summary judgment as to Count III on three grounds. First, Cummins contends that, as a matter of law, Section 6(f) of the License Agreement does not impose a duty on Cummins to refrain from installing its ISF Plus System in place of TAS Temp-A-Stop product. Second, Cummins argues that TAS' damages claim is speculative under Illinois law. Third, Cummins claims that Count III is barred by *res judicata*.

This Court previously granted Cummins summary judgment as to Count III. *See* Orders of March 31, 2009 (Doc. 145) and May 18, 2010 (Doc. 254). The March 31, 2009 Order was later vacated by the Court because it was based on a misunderstanding of TAS' claim in Count III. The May 18, 2010 Order awarded judgment to Cummins on the basis of *res judicata*. However, the Court subsequently modified its holding, determining that TAS is not barred from pursuing a claim for

breach of contract for breaches that occurred after entry of judgment in *TAS I*. (Docs. 273, 287). Because the *res judicata* issue has been resolved, the Court need only consider Cummins' two remaining arguments: that the "all reasonable efforts" clause does not impose a duty on Cummins to refrain from installing its ISF Plus System in place of Temp-A-Stop, and that TAS' damages claim is speculative.

### 1. *Section 6(f) of the License Agreement*

First, it is important to make clear what TAS assumes and what it does *not* assume for the purposes of Count III. As stated above, in its Fifth Amended Complaint, TAS explicitly assumes (for the purposes of Count III only) "that Cummins developed the ISF Plus System prior to signing the License Agreement and independent of TAS . . . ." (Doc. 205 at 13, ¶ 66). However, assuming this, TAS further asserts that "the ISF Plus System was not incorporated into any engine that Cummins manufactured, sold or delivered to OEMs prior to signing the License Agreement." *Id.* at 13-14, ¶66. In other words, TAS is willing, for the purposes of Count III, to assume that Cummins had (independently) *developed* ISF Plus before singing the License Agreement, but *not* that Cummins had *implemented* ISF Plus before signing the License Agreement. The License Agreement was signed on February 22, 1997. (Doc. 238 at 3, ¶ 1).

The date of implementation of the ISF Plus System—that is, the date upon which Cummins began placing ISF Plus on engines delivered to OEMs—is not in dispute, though as discussed *infra*, Cummins' Motion for Summary Judgment unnecessarily obfuscated the issue.

In Cummins' Statement of Undisputed Material Facts in its Motion and Memorandum in Support of Summary Judgment as to Count III, it states that "Cummins' ISF has been in existence on electronic engines since at least 1990, and similar technology has been used in the heavy duty trucking industry for decades." (Doc. 219 at 8, ¶ 15). It then notes that

> [f]rom a hardware perspective, accessory shutdown consists of two parts: an on/off switch, also known as a relay, and a port or pinout on Cummins' Electronic Control Module . . . that allows the ECM to send a signal to the relay. *Such relays and switches have been used in the engine control industry for decades*.

*Id.* at 8, ¶ 16 (emphasis added). Note that Cummins is not asserting that the accessory shutdown has existed for decades, but rather that the parts that go into making an accessory shutdown feature have existed for that long. Finally, Cummins claims that it is an undisputed material fact that "[t]he accessory shutdown sub-feature is a minor feature of the general ISF Plus feature." *Id.* at 9, ¶ 18. Nowhere in its Statement of Undisputed Material Facts does Cummins unambiguously state the date upon which it began incorporating the ISF *Plus* System *with the accessory shutdown feature* into engines which Cummins manufactured, sold or delivered to OEMs. In TAS' Motion in Opposition to Summary Judgment, TAS disputes Cummins' assertion that "Cummins' ISF has been in existence on electronic engines since at least 1990." The Court notes that before responding to Cummins' statement, TAS alters the text of the paragraph from "Cummins ISF has been in existence . . ." to "Cummins ISF [*Plus System*] has been in existence . . . ." (Doc. 238 at 7, ¶ 15) (emphasis added). TAS then goes on to dispute this (altered) assertion,

stating that "the accessory shutdown feature of the ISF Plus System was not included by Cummins on an engine delivered to an OEM until July 1997." *Id.* at 8, ¶ 7. In TAS' Statement of Additional Undisputed Material Facts, TAS writes that Cummins admitted "that it first placed the ISF Plus System (which included an accessory shutdown feature) on an engine delivered to an OEM approximately four months *after* it signed the License Agreement with TAS." *Id.* at 30, ¶ 10. Cummins finally concedes this point in its reply, noting first that "Cummins had a functional version of the accessory shutdown capability of its ISF Plus system since at least 1996," but then admitting "that in approximately July 1997, Cummins began manufacturing, selling, and delivering engines to its OEMs containing its ISF Plus system." (Doc. 240 at 14, ¶ 31).

It is therefore undisputed that the ISF Plus System—the engine-shutdown system that *also* had accessory shutdown capability—was not implemented until July 1997. TAS and Cummins entered into the License Agreement on February 22, 1997. (Doc. 238 at 3, ¶ 1). This means, of course, that the ISF Plus System was first placed on engines delivered to OEMs several months *after* the parties entered into the License Agreement. For the purposes of the present Motion, the Court finds this to be a critical fact.

Were Cummins able to show that the ISF Plus System had been implemented *before* it signed the License Agreement with TAS, this Court would find that, as a matter of law, Cummins would not be prohibited from using that technology in its engines, and that Cummins would be under no obligation—from

11

the "all reasonable efforts" clause or any other clause in the License Agreement—to substitute Temp-A-Stop for the ISF Plus System. If this were the case—if TAS had desired an arrangement in which Cummins would be required to forego the use of Cummins' own independently-developed *and previously-implemented* technologies—it was free to negotiate a contract with those terms. A requirement that a licensee jettison its existing technology when that technology is already in use is not a contractual provision that may simply be implied from a "reasonable efforts" clause. This Court recognizes that such an interpretation of the requirements of a reasonable/best efforts clause puts it at odds with interpretations of similar clauses by other courts. *See, e.g., Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609 (2d Cir. 1979) (holding that defendant's promotion of its own product (that defendant sold before entering into the agreement with plaintiff and continued to sell thereafter) at the expense of plaintiff's product was a breach of the contract's "best efforts" clause). However, such contrary holdings must be reconciled with the widely-accepted proposition that "[t]he obligation to use one's best efforts on behalf of another does not require the obligor to ignore its own interests." *Grant v. Bd. Of Educ. Of Chicago*, 668 N.E.2d 1188, 1197 (Ill. App. Ct. 1996); *see also Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Company*, 30 N.Y.2d 34 (N.Y. 1972).[1]

---

[1] Despite this language, whether the defendants in both *Grant* and *Van Valkenburgh* breached best efforts clauses was determined to be a fact question for the jury. *Grant* is distinguishable in that it is not factually analogous to the present case: the best efforts clause in that case involved a promise to use best efforts in negotiating a collective bargaining agreement. *Van Valkenburgh* is a closer case. In *Van Valkenburgh*, a publisher promised to use its best efforts in promoting an author's book. The publisher subsequently published and promoted a competing

Additionally, this Court believes that if parties to a contract contemplated the wholesale replacement of the licensee's previously-implemented product with the licensor's product, such a drastic measure would be—and could easily be—included in the express terms of the contract, and "[t]here is a strong presumption against provisions that easily could have been included in the contract but were not." *Wright v. Chicago Title Ins. Co.*, 554 N.E.2d 511, 514 (Ill. App. Ct. 1990).

But in the present case, TAS asserts—and Cummins does not dispute—that Cummins did not employ an ISF system that shut down both the engine and accessories prior to signing the License Agreement. According to Cummins, Cummins had already developed the necessary technology for the product, but that technology had not yet been put into engines. Although the Court would be willing to find that the preexisting *use* of a system that was functionally identical to Temp-A-Stop would entitle Cummins to summary judgment, proof of the mere *existence* of the necessary predicate technology does not.

This does not mean, of course, that Cummins is necessarily prevented from developing its own technology to compete with Temp-A-Stop as a matter of law. TAS bargained only for an "all reasonable efforts" clause, not a non-compete clause; TAS

---

book, at least partly because the author refused to accept a reduced royalty. But in *Van Valkenburgh*, the "competing" product—the second book—was not produced until *after* the agreement with the author was signed. This is, of course, similar to what happened in the present case: ISF Plus (the "competing" product) was not produced (or, more specifically, included in engines) until after the License Agreement had been signed. Had the plaintiff in *Van Valkenburgh* argued that the defendant breached by *continuing* to promote a competing book that had been published and promoted by the publisher *before* signing the agreement with the author, this Court, at least, would have held that no reasonable jury could find that the defendant breached the best efforts clause.

13

may therefore avail itself to the protections of the former clause, but this Court will not invent the latter. Courts have long held that a "best efforts" clause does not necessarily impose a burden on a licensee equivalent to that of a covenant not to compete. *See Autotech Technologies Ltd. Partnership v. Automationdirect.com, Inc.*, 249 F.R.D. 530, 534 (N.D. Ill. 2008); *Van Valkenburgh*, 30 N.Y.2d at 45-46; *Thorn Wire Co. v. Washburn & Moen Co.*, 159 U.S. 423, 449-50 (1895).

What this does mean is that this Court must reject Cummins' argument that it has, in essence, an absolute, unrestrained "license to compete" with TAS' Temp-A-Stop product. Cummins is correct in its assertion that "[u]nder Illinois law, in the absence of a non-competition clause, a licensee has no absolute duty to refrain from producing and selling a competing product." (Doc. 219 at 24). But it does not necessarily follow that a licensee could *never* breach a best/reasonable efforts clause by competing with the licensor—a point which the Seventh Circuit made clear in *Roboserve, Inc. v. Kato Kagaku Co. Ltd.*, 78 F.3d 266 (7th Cir. 1996).

In *Roboserve*, a company that leased and serviced hotel room mini-bars sued the company that owned the Hyatt Regency Chicago for, among other things, breach of contract. Roboserve was to install 1000 of its "Robobar" mini-bars in rooms in the Hyatt. The agreement between the parties required the Hyatt to use "reasonable endeavors" to place those guests most likely to use mini-bars in the Robobar rooms and to encourage them to make purchases from the mini-bars. However, Hyatt did not permit Roboserve to install all 1000 of the mini-bars, and Hyatt then had mini-bars from one of Roboserve's competitors installed. A jury had

14

awarded Roboserve $2.1 million for breach of contract. Kato (Hyatt) argued on appeal that the agreement's "reasonable efforts" clause was too vague to be enforceable. The Seventh Circuit upheld the jury's finding that Kato breached the "reasonable endeavors" clause of the contract:

> "Reasonable efforts" clauses are enforceable in Illinois. The question of what is reasonable under a contract is an issue of fact for the trier of fact. . . . The evidence demonstrates that Kato could have placed Robobars in the more upscale Gold Passport rooms, but it did not. Kato could have informed its guests of the Robobars and given them brief instructions as to their use, but it did not. *At the very least, Kato could have refrained from establishing and promoting a competing product line within the . . . [hotel] itself, but it did not*. By agreeing to this provision, Kato was committed to a number of "endeavors" that it did not perform but that Roboserve (and the jury) could have considered reasonable. Whatever the precise affirmative duties of one bound to use "reasonable endeavors" to promote a product, the jury could reasonably have found that Kato had not complied.

*Roboserve*, 78 F.3d at 278 (emphasis added). Although the contract at issue in *Roboserve* did not involve a non-competition clause, the Seventh Circuit still found that the "competitive" activities of Kato could be considered by a jury when determining whether the "reasonable endeavors" clause was breached. True, a "reasonable efforts" clause carries with it no *per se* rule against competition by the licensee. But, depending on the "nature of the undertaking for which the 'best efforts' commitment has been made," *Grant*, 668 N.E.2d at 1197, *Roboserve* makes clear that a licensee's competitive activity may constitute evidence of a breach of such a clause.

Cummins states that *Roboserve* "does not support TAS' argument that, as a matter of law, Cummins is precluded from offering a competing product." (Doc. 219

15

at 25). However, as TAS points out, "Cummins misses the point. TAS is not seeking summary judgment as to its Section 6(f) claim; it is satisfied to have this claim decided by a jury." (Doc. 238 at 44-45). This Court agrees with TAS in its appraisal of Cummins' Herculean efforts at distinguishing *Roboserve* and other clearly contrary case law: Cummins simply misses the point. Cummins presses the Court to decide whether Cummins was precluded, as a matter of law, from installing ISF Plus in its engines on the grounds that ISF Plus competes with TAS' Temp-A-Stop product. But that is not the inquiry in which this Court must engage in deciding, based on the absence of any disputed material fact in the record, whether Cummins is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(a). Rather, the inquiry is whether a reasonable jury could find that Cummins' substitution of its ISF Plus System in place of TAS' Temp-A-Stop product constitutes a breach of Cummins' obligation under Section 6(f) to use "all reasonable efforts to market and sell ECM Products and Retrofit Products so as to maximize the payment of royalties to Licensor . . . ." (Doc. 236, Ex. 2A, License Agreement ¶ 6(f)). Based on the foregoing, this Court determines that a reasonable jury could find that Cummins' use of ISF Plus to the exclusion of Temp-A-Stop constitutes a breach of Section 6(f).

### 2. *Damages*

Cummins argues that TAS' damages claims are speculative under Illinois law, and that "TAS cannot show that its 'lost profits' damages are sufficiently particularized under the New Product/Business Rule." (Doc. 219 at 28). TAS

16

counters that, unlike its claim in *TAS I*, TAS' damages calculation in the present case would be simple:

> In *TAS I*, to support its claim that Cummins did not adequately market the licensed product . . . , TAS attempted to estimate how many Temp-A-Stop units would have been placed on Cummins' engines if Cummins had, hypothetically, increased its marketing efforts . . . . In contrast, in its Section 6(f) claim, TAS contends that every time that Cummins improperly substituted its ISF Plus System for the licensed Temp-A-Stop System, it deprived TAS of a royalty, as specified in Section 5(b) of the License Agreement . . . . This calculation requires no estimate of sales under "but-for" conditions. It is based on actual sales, Cummins' own actual sales data . . . , and the royalty formula in Section 5(b).

(Doc. 238 at 47). Under this theory of damages, the amount to which TAS would be entitled would be, according to TAS, "precisely calculable without any need for estimation: the number of engines upon which Cummins improperly substituted ISF Plus times the royalty it would have owed had it used the licensed engine-stop product." (Doc. 149 at 8). Further, TAS claims the New Business Rule is inapplicable, as the Rule has never "been applied to a damage calculation which requires no estimate of but-for sales." (Doc. 238 at 48).

Under the New Business Rule, a plaintiff is generally prevented from recovering lost profits for a new business, as such damages would be too speculative. *Kinesoft Dev. Corp. v. Softbank Holdings Inc.*, 139 F. Supp. 2d 869, 908 (N.D. Ill. 2001). Furthermore, "Illinois' new business rule can apply when an entity, while established in the field, markets a new product." *TAS Distributing Co., Inc. v. Cummins Engine Co., Inc.*, 491 F.3d 625, 634 (7th Cir. 2007). There are, however, several exceptions to the New Business Rule. *Kinesoft*, 139 F. Supp. 2d at 909.

17

It is true, as Cummins contends, that the ISF Plus System and TAS' Temp-A-Stop product are not identical products. ISF Plus is an ECM-resident feature, while Temp-A-Stop is a Retrofit product. (Doc. 219 at 29). Furthermore, ISF Plus differs from Temp-A-Stop because "TAS' Temp-A-Stop product does not cut off fuel flow like the Cummins product." *Id.* But what is material to the present issue is not how the products differ in the manner in which they carry out their functions, but rather whether they perform different functions. In other words, the question is not whether the products are *identical*, but whether they are *functionally identical*.

Cummins' ISF Plus System and TAS' Temp-A-Stop product are functionally identical. Both products shut off a vehicle's engine and certain accessories. In *Milex Prods. v. Alra Labs, Inc.*, 603 N.E.2d 1226 (Ill. App. Ct. 1992), the court found that an expert could base a damages calculation on the sales of "actual products in the marketplace"—in that case, drugs that were the *functional equivalent* of the subject drug. Thus, even though the drug in *Milex* was a "new product," because there was a non-speculative basis for estimating sales of plaintiff's product (namely, drugs that were the functional equivalent of plaintiff's drug), the proof of lost profits "was neither speculative nor the product of conjecture but was based upon a reasonable degree of certainty." *Milex*, 603 N.E.2d at 1237. In the present case, the damages calculation is even more straightforward than in *Milex*: the "marketplace" for TAS' product is simply every engine sold by Cummins in which ISF Plus was substituted for Temp-A-Stop.

In contrast to *TAS I*, the damages calculation in the present case is simple and non-speculative. This Court finds that even if Temp-A-Stop qualifies as a "new product" under Illinois law, "proof of lost profits . . . [may be] based upon a reasonable degree of certainty," *TAS I*, 491 F.3d at 635 (citing *Milex*, 603 N.E.2d at 1236), and TAS' second ground in support of summary judgment must therefore be rejected.

## CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment as to Count III of the Fifth Amended Complaint filed by Defendant, Cummins, Inc., on December 18, 2009 (Doc. 219) is DENIED.

IT IS SO ORDERED.

Entered this 28th day of October, 2011.

                                                      s/ Joe B. McDade
                                                     JOE BILLY McDADE
                                          United States Senior District Judge